[No. B098665. Second Dist., Div. Five. June 17, 1996.]

C. STERLING WOLFE, Plaintiff and Appellant, v.
STATE FARM FIRE & CASUALTY INSURANCE CO. et al., Defendants and Respondents.

556

**COUNSEL**

Raphael Metzger and Thomas F. Hall for Plaintiff and Appellant.

Heller, Ehrman, White & McAuliffe, Paul Alexander, Vanessa Wells, R. Renee Glover, Munger, Tolles & Olson, Ronald K. Meyer, Barger & Wolen, Kent R. Keller, Royal F. Oakes, Steven H. Weinstein, Larry M. Golub, McCutchen, Doyle, Brown & Enersen, James P. Kleinberg, Carissa M. Smith, Leboeuf, Lamb, Greene & Macrae, Dean Hansell, Allyson S. Taketa, James R. Woods, Sanford Kingsley, Cheryl D. Orr, Nolan B. Henderson, Thelen, Marrin, Johnson & Bridges, Curtis A. Cole, William F. Holbrook, Pillsbury, Madison & Sutro, Robert M. Westberg, Reginald D. Steer and Joseph A. Hearst for Defendants and Respondents.

## OPINION

**GODOY PEREZ, J.**—Plaintiff C. Sterling Wolfe appeals from the judgment of dismissal entered after demurrers to his complaint were sustained without leave to amend. For the reasons set forth below, we affirm the judgment.

### FACTS AND PROCEDURAL HISTORY

In the early morning hours of January 17, 1994, the "Northridge earthquake" rumbled through Southern California, killing some and injuring others, while leaving a trail of destroyed or damaged homes in its wake. To those fortunate (and prescient) enough to have earthquake insurance, more than $11 billion in property damage claims were paid by their insurers. Residential real property insurers expressed both alarm at the extent of the claims and concern whether they could meet their obligations in the event of another such disaster. Because insurers offering homeowners coverage are required by law to offer earthquake insurance as well (Ins. Code, § 10081), those insurers decided to stop or reduce their sales of homeowners insurance in order to avoid writing new earthquake policies.[1]

In response, plaintiff and appellant C. Sterling Wolfe (appellant), acting as a "private attorney general," filed a complaint seeking injunctive relief against 17 of the largest residential real property insurers in the state on the ground that their refusal to sell new policies was an unfair business practice under Business and Professions Code section 17200.[2] Those insurers—the defendants and respondents here—are: State Farm Fire & Casualty Insurance

---

[1]We were asked by respondents to judicially notice these facts on appeal. We do so for the reasons set forth in the section titled "STANDARD OF REVIEW."

[2]Business and Professions Code section 17200 is part of the Unfair Practices Act (Bus. & Prof. Code, § 17000 et seq.) and prohibits any unlawful, fraudulent or unfair business

Co.; State Farm Mutual Automobile Insurance Co.; Allstate Insurance Co.; Fire Insurance Exchange; Farmers Insurance Exchange; California State Automobile Association, also known as Automobile Club of Northern California; Inter-Insurance Exchange, also known as Automobile Club of Southern California; Fireman's Fund Insurance Companies; Associated Indemnity Corporation; United Services Automobile Association; Safeco Insurance Co.; Federal Insurance Co.; Republic Insurance Co.; TIG Insurance Co., erroneously sued as Transamerica Insurance Co.; Hartford Fire Insurance Co.; Western Mutual Insurance Co.; and Prudential Property & Casualty Co.[3]

The complaint, filed in December 1994, alleged that respondents, acting in concert, stopped or curtailed sales of new homeowners policies throughout the state. As a result, prospective homebuyers were unable to procure financing since obtaining homeowners insurance is a lending requirement. Delays in obtaining insurance would squeeze some buyers out of the market due to rising interest rates and the concomitant effect on the buyers' ability to qualify for home loans. Because of the strong public interest in fostering home ownership and the stability of the residential real estate market, contrasted against the "minimal utility" of respondents' conduct, respondents were engaged in an unfair business practice which had to be enjoined.[4]

On December 22, 1994, the court denied appellant's application for a preliminary injunction because there was no evidence that the respondents were trying to pressure the state insurance commissioner to approve increased rates and no evidence of a conspiracy among the respondents. Shortly after, respondents demurred to the complaint on various grounds, among them that the action should be stayed under the "primary jurisdiction" doctrine to permit the insurance commissioner to administratively investigate the charges.[5] On April 4, 1995, the action was stayed on this ground to permit the state insurance commissioner to consider appellant's allegations.

---

practice. Injunctive relief under Business and Professions Code section 17200 may be sought not only by government prosecutors but by any person acting for the interests of the general public. (Bus. & Prof. Code, § 17204.)

[3]These parties will be referred to as "respondents."

[4]These allegations formed the basis of appellant's complaint. The remaining facts set forth *post* do not come from the complaint but instead comprise the complaint's postfiling procedural history.

[5]The doctrine of "primary jurisdiction" is closely related to the exhaustion of remedies doctrine. The latter applies where a claim is cognizable in the first instance by an administrative agency alone. The courts will not interfere until the administrative process has run its course. Primary jurisdiction, however, applies when a claim is originally cognizable in the courts but enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body. The

The court stayed the matter until October 6, 1995, when a further hearing on the sufficiency of the demurrers would be held.

Appellant filed a complaint with the Department of Insurance on April 6, 1995. Pursuant to Insurance Code section 790.06, state Insurance Commissioner Chuck Quackenbush (Commissioner Quackenbush) investigated appellant's complaint during the summer of 1995.[6] After a special investigatory hearing, Commissioner Quackenbush determined in September 1995 that there was "neither probable cause nor substantive evidence to believe that the [respondents] are engaged in practices which are unfair or otherwise in violation of the California Insurance Code."

The matter then returned to the trial court for further briefing on the propriety of respondents' demurrers. Among the many grounds raised in this second round of briefing was the contention that judicial interference in a matter involving the highly regulated insurance industry, especially when the Legislature was taking steps to address the issue—was unwarranted and improper. In mid-October 1995, the Governor signed into law Assembly Bill Nos. 13 and 1366, two measures intended to ease the earthquake and homeowners insurance availability problem.[7]

At a hearing on November 13, 1995, the court sustained the demurrers without leave to amend, stating in part that the issues raised were best addressed by the Legislature.

We find this ground persuasive and controlling and therefore need not address the myriad other issues raised by the parties' briefs.

### STANDARD OF REVIEW

■ In reviewing a judgment of dismissal after a demurrer is sustained without leave to amend, we must assume the truth of all facts properly pleaded by the plaintiff-appellant. (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311,

judicial process is therefore suspended pending referral of those issues to the administrative body for its view. (*Farmers Ins. Exchange* v. *Superior Court* (1992) 2 Cal.4th 377, 390-391 [6 Cal.Rptr.2d 487, 826 P.2d 730].) In short, exhaustion applies where an agency alone has exclusive jurisdiction over a case and primary jurisdiction applies where both a court and an agency have the legal capacity to deal with the matter. (*Ibid.*)

[6]Insurance Code section 790.06 is part of the Unfair Insurance Practices Act (Ins. Code, § 790 et seq.) and empowers the commissioner to investigate and enjoin a variety of unfair business practices by insurance companies. Unless otherwise indicated, all further statutory references are to the Insurance Code.

[7]The purpose and provisions of these measures are discussed in detail, *post*, in DISCUSSION, part 2 of this decision.

318 [216 Cal.Rptr. 718, 703 P.2d 58].) Regardless of the label attached to the cause of action, we must examine the complaint's factual allegations to determine whether they state a cause of action on any available legal theory. (*Saunders* v. *Cariss* (1990) 224 Cal.App.3d 905, 908 [274 Cal.Rptr. 186].) Reversible error is committed if the facts alleged show entitlement to relief under any possible legal theory. (*Platt* v. *Coldwell Banker Residential Real Estate Services* (1990) 217 Cal.App.3d 1439, 1444 [266 Cal.Rptr. 601].)

We will not, however, assume the truth of contentions, deductions or conclusions of fact or law (*Moore* v. *Regents of University of California* (1990) 51 Cal.3d 120, 125 [271 Cal.Rptr. 146, 793 P.2d 479, 16 A.L.R.5th 903]), and may disregard allegations that are contrary to the law or to a fact of which judicial notice may be taken. (*Fundin* v. *Chicago Pneumatic Tool Co.* (1984) 152 Cal.App.3d 951, 955 [199 Cal.Rptr. 789].)

We were asked by respondents on appeal to judicially notice those facts arising from the Northridge earthquake which led to their decision to halt or limit the sale of new homeowner policies even though they were not part of appellant's complaint. (See fn. 1 and accompanying text, *ante.*) That request was not opposed by appellant. ■ Facts not alleged in a complaint may be judicially noticed when necessary in the interests of justice. (*Cantu* v. *Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 877 [6 Cal.Rptr.2d 151].) As discussed in detail *post,* we decline to judicially intervene because the Legislature has acted to address the homeowners insurance availability problem. To ignore the events which triggered that problem and the legislative response to it would be judicial folly. We therefore refuse to decide this matter in a factual vacuum simply because appellant has chosen to omit these critical contextual facts from his complaint.

■ We must take judicial notice of the Northridge earthquake itself since that occurrence is a fact of generalized knowledge so universally known that it cannot reasonably be the subject of dispute. (Evid. Code, § 451, subd. (f).) That insurers are obligated to offer earthquake coverage along with homeowners insurance is a statutory requirement under Insurance Code section 10081 and we are obligated to take judicial notice of that law. (Evid. Code, § 451, subd. (a).) That respondents stopped or curtailed new policy sales for the stated reason they were concerned about the risk being assumed and their ability to pay all claims in case of another earthquake may be judicially noticed for two reasons: (1) it is part of the record of a related administrative proceeding (*Heston* v. *Farmers Ins. Group* (1984) 160 Cal.App.3d 402, 413-414 [206 Cal.Rptr. 585]; *Hogen* v. *Valley Hospital* (1983) 147 Cal.App.3d 119, 125 [195 Cal.Rptr. 5]); and (2) it is also part of

the legislative history of statutes enacted in response to the availability problem. (See Sen. Com. on Rules, Analysis of Assem. Bill No. 1366 (1995-1996 Reg. Sess.) as amended on Sept. 12, 1995; *People v. Sterling Refining Co.* (1927) 86 Cal.App. 558, 564 [261 P. 1080]; see also fn. 16 and accompanying text, *post.*)

## DISCUSSION

1. *Proposition 103 and Claims for Unfair Business Practices Under Business and Professions Code Section 17200*

Proposition 103, passed by the voters on November 8, 1988, made sweeping fundamental changes in the regulation of residential real property and other types of insurance.[8] The initiative's preamble includes findings that " '[e]normous increases in the cost of insurance have made it both unaffordable and unavailable to millions of Californians' " and that " '[t]he existing laws inadequately protect consumers and allow insurance companies to charge excessive, unjustified and arbitrary rates.' " The stated purpose of the measure is to ensure that " 'insurance is fair, available, and affordable for all Californians.' " (See Historical and Statutory Notes, 42A West's Ann. Ins. Code (1993 ed.) § 1861.01, p. 649.)

In addition to requiring an elected insurance commissioner and rolling back certain insurance rates by 20 percent, Proposition 103 provided that the insurance industry be subject to the Unruh Civil Rights Act (Civ. Code, §§ 51-53, hereafter the Unruh Act), antitrust laws and the unfair business practice laws, including Business and Professions Code section 17200. (§ 1861.03, subd. (a).) We are concerned with the latter provision.[9]

An action for unfair trade practices under Business and Professions Code section 17200 arises when a business practice "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. [Citation.]" (*People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 530 [206 Cal.Rptr. 164, 53 A.L.R.4th 661].)

---

[8]Proposition 103 applies to all types of insurance except those listed in section 1851. (§ 1861.13.) Section 1851 lists reinsurance, life insurance, title insurance, disability insurance, workers' compensation insurance, certain types of marine insurance, mortgage insurance and insurance transacted by county mutual fire insurers.

[9]Proposition 103 also required, among others, that automobile insurance rates be based on factors such as the insured's driving record and experience, that good drivers receive a discount, and that automobile insurers be required to offer and sell good driver insurance to qualified motorists. (§§ 1861.02, 1861.025, 1861.15.) It also established a system for approving or rejecting rate changes. (§ 1861.05.)

Appellant contends that respondents' conduct is actionable as an unfair business practice because it both offends the public policy of insurance availability stated in the preamble to Proposition 103 and is substantially injurious to California consumers.[10]

## 2. *The Demurrers Were Properly Sustained in Order to Preserve the Legislature's Decisionmaking Role*

■ The appellate courts have "neither the power nor the duty to determine the wisdom of any economic policy; that function rests solely with the legislature. . . ." (*Max Factor & Co.* v. *Kunsman* (1936) 5 Cal.2d 446, 454 [55 P.2d 177].) Judicial intervention in complex areas of economic policy is inappropriate. (*Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1168, fn. 15 [278 Cal.Rptr. 614, 805 P.2d 873], hereafter *Harris.*)

In affirming an order sustaining the defendants' demurrer, the *Harris* court considered and rejected the contention that the Unruh Act should be construed to prohibit residential landlords from using minimum income formulas to determine a prospective tenant's financial fitness. The plaintiffs argued that widespread use of such formulas discriminated against the poor and women and therefore constituted both economic and sex discrimination.[11]

The plaintiffs contended the Unruh Act required landlords to individually evaluate each prospective tenant's ability to pay rent, using such factors as prior rental history. The landlords contended their minimum income policy was reasonably calculated to protect their legitimate interest in screening out tenants at risk of default. A trial in such a case would require a landlord-by-landlord evaluation and devolve into a battle of economic experts. Stepping into that fray would "involve the courts of this state in a multitude of microeconomic decisions we are ill equipped to make. . . ." (*Harris, supra,* 52 Cal.3d at p. 1166.)

To avoid the difficulties inherent in judicial intervention, ". . . the economics of credit practices, whether those of landlords or other businesses, have traditionally been left to the guidance of market forces or to specific legislative and administrative action designed to address particular grievances. [Citations.]" (52 Cal.3d at pp. 1167-1168.) Neither the language nor history of the Unruh Act supported a judicial extension of that act to

---

[10]Appellant also argues that respondents' conduct is immoral, unethical, oppressive and unscrupulous, but this contention is based solely on the alleged violation of Proposition 103's public policy statement.

[11]The Unruh Act prohibits businesses from discriminating on a variety of grounds, including sex, race, color, religion, national origin or physical disability. (Civ. Code, § 51.)

economic criteria, "which by their nature seek to further the legitimate interest of business establishments in controlling financial risk while providing goods and services on a nondiscriminatory basis." (*Id.* at p. 1148.) "In the absence of clear legislative direction, which the antidiscrimination provisions of the Unruh Act do not provide, we are unwilling to engage in complex economic regulation under the guise of judicial decisionmaking. [Citation.]" (*Id.* at p. 1168.)

The court in *California Grocers Assn.* v. *Bank of America* (1994) 22 Cal.App.4th 205 [27 Cal.Rptr.2d 396] (hereafter *Grocers*), relied on the same reasoning in reversing a trial court judgment which enjoined the defendant bank from imposing certain service charges on the ground that they were unconscionable and therefore an unfair business practice. Assuming for discussion's sake only that unconscionable service charges could give rise to a claim under Business and Professions Code section 17200, the *Grocers* court held the case implicated a question of economic policy—whether service fees charged by banks are too high and should be regulated—which was best left to the Legislature. (22 Cal.App.4th at p. 218.)

Finally, in *Korens* v. *R. W. Zukin Corp.* (1989) 212 Cal.App.3d 1054 [261 Cal.Rptr. 137] (hereafter *Korens*), the court affirmed a summary judgment for the defendant landlords in a class action suit which contended the failure to pay interest on a tenant's security deposit was an unfair business practice under Business and Professions Code section 17200.

Even though no state or local law required landlords to pay interest on a tenant's security deposits, the plaintiffs contended that Civil Code section 1950.5, which governed the retention and repayment of such deposits, impliedly created a trust relationship and therefore an implied duty to do so. The *Korens* court rejected this argument, noting that the subject of security deposits was extensively regulated by the Legislature, that if the Legislature had wanted to require the payment of interest on security deposits, it would have done so expressly, and that the Legislature had in fact repeatedly refused to do so. (*Korens, supra,* 212 Cal.App.3d at pp. 1058-1059.) The court therefore "declined[d] the invitation to do that which the Legislature has left undone." (*Id.* at p. 1059.)

■ Synthesizing the decisions in *Harris, Grocers* and *Korens,* the situation here, while not identical, is highly analogous. First, the insurance industry is heavily regulated. With three exceptions not relevant here, however, nothing in the Insurance Code prohibits an insurer from deciding to

halt or curtail its sale of new policies.[12] Section 674.6 requires various insurers, including those offering residential real property insurance, to notify the commissioner before substantially withdrawing from a line of insurance but does not prohibit such conduct. Moreover, to substantially withdraw is defined as nonrenewal of more than half of an insurer's existing policies, not the refusal to issue new policies. In short, and as appellant concedes, the respondents have violated no laws.

Next, we find it debatable whether the stated purpose of Proposition 103 articulates a public policy applicable to these facts. The findings which underlay that initiative were "[e]normous increases in the cost of insurance [which] have made it both unaffordable and unavailable to millions of Californians." Its stated purpose, therefore, was, among others, to "ensure that insurance is fair, available, and affordable for all Californians." The evil sought to be remedied is thus unavailability due to high insurance costs, not unavailability due to a cessation of sales.

This is made clear by the presence in Proposition 103 of only one provision requiring the sale of insurance—the mandatory good driver's discount of section 1861.15. If the voters had wanted to require other insurers to offer and sell other types of coverage, we presume they would have said so.

In contrast, section 10090 et seq. established the FAIR Plan (fair access to insurance requirement), obligating all real and personal property insurers to establish a program to apportion among themselves the responsibility to provide basic property insurance for those who, after diligent efforts, were unable to obtain insurance through normal market channels. (§§ 10093, subd. (a), 10094.) The stated purposes of the FAIR Plan include: "(a) To assure stability in the property insurance market for property located in the State of California. [¶] (b) To assure the availability of basic property insurance as defined by this chapter." (§ 10090, subds. (a), (b).) It is equally arguable that if the state has adopted a public policy to ensure the availability of property insurance to those who have tried and failed to obtain it, the FAIR Plan is the most likely expression of that policy.[13]

We need not decide that issue, however. Assuming for discussion's sake only that appellant can state a cause of action for unfair trade practices based

---

[12]Section 671 prohibits an automobile insurer from refusing to issue a policy for comprehensive coverage based solely on the age of the car to be insured, so long as the car is worth more than $2,500. Section 679.71 makes it unlawful for any insurer to fail or refuse to accept an application or issue a policy based on an applicant's marital status, sex, race, color, national origin or ancestry. Section 1861.15 requires automobile insurers to offer and sell good driver discount policies to qualified motorists.

[13]For example, under section 10091, subdivision (c) of the FAIR Plan legislation, the state Insurance Commissioner may designate the geographic or urban areas where FAIR Plan insurance will be sold. In response to the cessation of homeowners insurance sales after the

on the public policy embodied in Proposition 103, as in *Grocers, supra,* 22 Cal.App.4th at page 218, that by itself does not permit unwarranted judicial intervention in an area of complex economic policy.[14]

Most important to our analysis, however, are the Legislature's attempts to grapple with the earthquake insurance availability problem. In October 1995 the Governor signed into law two bills enacted by the Legislature in response to the cutbacks in new homeowners policy sales—Assembly Bill Nos. 13 and 1366. (Sen. Com. on Rules, Analysis of Assem. Bill No. 1366 (1995-1996 Reg. Sess.) as amended on Sept. 12, 1995 [Assem. Bill No. 13 and Assem. Bill No. 1366 "provide the basis for providing earthquake coverage to homeowners"].)

Previously, section 10089 obligated insurers to minimally provide earthquake insurance which covered the dwelling, personal property and additional living expenses of at least $1,500 if the dwelling were uninhabitable. (Former § 10089, subd. (a).) Section 10089.1 also obligated insurers to offer insurance which covered structural engineering costs to determine a dwelling's habitability and the cost of demolishing a condemned dwelling. Assembly Bill No. 1366 repealed section 10089.1 and substantially reduced the minimum earthquake coverage which residential real property insurers were obligated to offer under section 10089 when selling homeowners insurance.[15]

Assembly Bill No. 1366 also amended the FAIR Plan to state that earthquake coverage sold by the plan as part of basic property insurance

Northridge earthquake, then Commissioner John Garamendi issued an emergency order effective July 1, 1994, extending the sale of FAIR Plan homeowners insurance from certain high-risk areas where such insurance was previously unavailable to the state as a whole. Commissioner Garamendi later ordered the FAIR Plan to prepare to sell a stand-alone earthquake policy. On September 12, 1995, Commissioner Quackenbush continued his predecessor's July 1994 emergency order in place. That order was rescinded by Commissioner Quackenbush effective May 31, 1996. Under Evidence Code section 452, subdivision (c), we are permitted to take judicial notice of these official acts of an executive department.

[14]Appellant contends judicial intervention is authorized by section 1861.03, subdivision (a) of Proposition 103, which made Business and Professions Code section 17200 specifically applicable to the insurance industry. Nothing in that section mandates that we permit a cause of action to proceed when judicial intervention is unwarranted under the principles stated in *Harris, Korens,* or *Grocers.*

[15]Section 10089, as amended by Assembly Bill No. 1366, now provides, in relevant part: "(a) At a minimum, an offer of coverage of loss or damage caused by the peril of earthquake pursuant to Section 10081 shall include the following coverages: (1) dwelling, not including outbuildings, appurtenant structures, swimming pools, masonry fences and walls not necessary for the structural integrity of the dwelling, walkways and patios not necessary for regular ingress or egress from the dwelling, awnings or other patio coverings, decorative or artistic features including plaster if other covering would be more cost-effective, landscaping, or masonry chimneys, provided that the policy covers replacement of a damaged masonry chimney with a nonmasonry, earthquake resistant chimney. An insurer that provides earthquake coverage for the dwelling that is narrower than coverage provided under the policy of

could only provide the minimum coverage established by the new version of section 10089. (§ 10091, subd. (c).) The purpose of Assembly Bill No. 1366 was to "provide relief to insurers which maintain that excessive exposure to earthquake losses threatens their solvency and prevents them from writing new homeowners policies. By reducing the scope of mandatory coverage, the author hopes to induce more insurers to return to active writing of homeowners and earthquake insurance." (Sen. Com. on Rules, Analysis of Assem. Bill No. 1366 (1995-1996 Reg. Sess.) as amended on Sept. 12, 1995.)

Assembly Bill No. 13 established the California Earthquake Authority (CEA). (§ 10089.5 et seq.) Once operative, the CEA will sell the basic earthquake coverage defined by section 10089. It will be funded by participating residential property insurers, bond sales and the purchase of reinsurance contracts, as well as by the premiums charged for policies sold. (§§ 10089.5, subds. (b), (f), (m), 10089.10, 10089.15, 10089.23, 10089.29, 10089.30.) Creation of the CEA was only provisional, however, pending participation by a sufficient number of insurers and further legislative action. (§ 10089.14.)

Section 1 of Assembly Bill No. 13 states: " '(e) The commissioner shall identify at least two alternatives to the California Earthquake Authority concept that address the problem of earthquake insurance and the unavailability of homeowners' insurance. The commissioner shall establish an earthquake insurance advisory committee with consumer and other representatives to identify and consider alternative solutions. [¶] (f) It is the intent of the Legislature to hold interim hearings on the earthquake insurance problem

---

residential property insurance shall, upon approval of the commissioner, establish the premium for the earthquake coverage in a manner that reflects the exclusion of those items not covered by the earthquake policy, rider, or endorsement; (2) contents coverage either in an amount not less than 10 percent of the amount of the covered dwelling loss, or in an amount not less than five thousand dollars ($5,000), provided that if the underlying policy of residential property insurance does not cover structural loss, the amount of contents coverage after deductible shall not be less than five thousand dollars ($5,000). The insurer shall elect at the time the insurer files its rate application with the commissioner which of the two contents coverages it will use to satisfy the requirements of this chapter. Upon election, the option shall be required to be offered to every policyholder who receives an offer of earthquake coverage pursuant to this chapter. In the case of either coverage, the insurer may exclude from coverage glassware, china, porcelain, or ceramic items, artwork, or other decorative items; and (3) additional living expenses of an amount no less than one thousand five hundred dollars ($1,500) to cover expenses while the residential dwelling remains uninhabitable . . . . [¶] (b) Coverages provided in paragraphs (1) and (2) of subdivision (a) shall not contain a deductible of more than 15 percent of coverage provided for the dwelling. [¶] (c) The commissioner may approve rate applications that allow the insurer to offer policies providing coverage other than the coverage specified in this section provided that at least one coverage offered meets the criteria provided in this section."

and on possible alternatives to solve this problem.' " (See Historical and Statutory Notes, 42B West's Ann. Ins. Code, § 10089.6 (1996 pocket supp.) p. 12.) The Legislature has therefore not only enacted certain measures to address the problems which gave rise to appellant's complaint, it has also made clear its intent to consider other measures as well.

Returning to our analytical starting point—a synthesis of *Harris, Grocers* and *Korens*—we see similarities which compel judicial restraint. As in those three decisions, no specific statutory provision prohibits respondents from stopping or curtailing sales of homeowners insurance policies.

And as in *Harris,* a judicial resolution of appellant's complaint would involve the courts in microeconomic managing. The gist of respondents' defense is that they each, individually, stopped or curtailed new policy sales because the Northridge earthquake demonstrated they had underestimated the amount of the risk which they had insured. As a result, writing new policies on the same scale as before exposed each respondent to the risk of insolvency and the inability to cover all claims that might be made by their earthquake insureds.[16]

We take judicial notice that all insurers doing business in California must meet certain minimum financial requirements, including the accumulation of reserves sufficient to cover all losses and claims for which they might be liable. (§ 700.01 [establishing minimum paid-in capital requirements for new insurers]; § 700.02 [setting minimum surplus requirements for same]; § 923.5 [requiring all admitted insurers to maintain reserves large enough to cover all losses and claims for which they might be liable]; § 985, subd. (b) [possession of sufficient reserves not enough to preclude commissioner's declaration of insolvency; insurer must also have sufficient paid-in capital].)

In short, respondents contend their actions were necessary in order to obey the law by maintaining the proper reserves and remaining solvent. Determining the validity of respondents' defense would necessarily involve the court in evaluating the potential risk being undertaken by each individual homeowners/earthquake insurer and analyzing their respective financial conditions to determine whether they would remain sufficiently solvent to undertake those risks.

---

[16]This defense was articulated during Commissioner Quackenbush's investigation of appellant's section 790.06 complaint and is part of the record of that administrative proceeding. We, of course, do not judicially notice the truth or correctness of this defense (*Ramsden* v. *Western Union* (1977) 71 Cal.App.3d 873, 879 [138 Cal.Rptr. 426]), but we are permitted to take judicial notice of the records and files of an administrative board (*Hogen* v. *Valley Hospital, supra,* 147 Cal.App.3d at p. 125) and may even take judicial notice of a position taken by a party during a previous administrative hearing. (*Heston* v. *Farmers Ins. Group, supra,* 160 Cal.App.3d at pp. 413-414.) Accordingly, we take notice of the fact that this defense was asserted by respondents.

Finally, our analysis hinges on the one respect in which this case differs from those cited above. In *Korens, supra,* the court refused to judicially legislate the payment of interest on a tenant's security deposit where the Legislature itself had expressly refused to do so. Here, as noted, the Legislature has expressly decided to tackle the problem.

We need not consider the wisdom or efficacy of Assembly Bill No. 13 and Assembly Bill No. 1366 or any other future legislation in regard to the earthquake insurance problem. It is enough that the Legislature has tried and will try again to address the problem. The availability of homeowners and earthquake insurance, its ramifications for the residential real estate market, and the need to guarantee that the insurers who write those policies can back them up when disaster strikes again, are peculiarly matters within the legislative domain. The Legislature's expressed intent to address these issues, both now and in the future, mandates judicial restraint as much if not more so than had it refused to do so. To paraphrase *Korens, supra,* 212 Cal.App.3d at page 1059, we decline the invitation to undo what the Legislature has done.[17]

## DISPOSITION

For the reasons set forth above, the judgment dismissing appellant's complaint is affirmed. Each party to bear its own costs on appeal.

Turner, P. J., and Armstrong, J., concurred.

---

[17]Because there is no reasonable possibility an amended pleading could permit judicial intervention on these facts, it was not an abuse of discretion to sustain respondents' demurrers on that ground without leave to amend. (*Hendy* v. *Losse* (1991) 54 Cal.3d 723, 742 [1 Cal.Rptr.2d 543, 819 P.2d 1].)