[No. B184533. Second Dist., Div. Three. Aug. 1, 2007.]

ALEX ALVARADO, Plaintiff and Appellant, v.
SELMA CONVALESCENT HOSPITAL et al., Defendants and Respondents.

1294

COUNSEL

McNicholas & McNicholas, Patrick McNicholas, Holly N. Boyer; Garcia Law Firm and Stephen M. Garcia for Plaintiff and Appellant.

Paul Gallegos, District Attorney (Humboldt), as Amicus Curiae on behalf of Plaintiff and Appellant.

Manatt, Phelps & Phillips, Barry S. Landsberg, Terri D. Keville, Joanna S. McCallum and Andrew H. Struve for Defendants and Respondents.

Hooper, Lundy & Bookman, Mark E. Reagan, Scott J. Kiepen and Felicia Y. Sze for California Association of Health Facilities as Amicus Curiae on behalf of Defendants and Respondents.

OPINION

KITCHING, J.—

## INTRODUCTION

Alvaro Alvarado (Alvarado), now deceased, filed a class action lawsuit under section 17200 et seq. of the Business and Professions Code (the unfair competition law; UCL) seeking restitution and injunctive relief to require owners and operators of skilled nursing and intermediate care facilities to comply with certain nursing hour requirements set forth in Health and Safety Code section 1276.5, subdivision (a).[1]

■ We affirm the trial court order sustaining a demurrer without leave to amend. The trial court did not abuse its discretion by abstaining from adjudicating this lawsuit. Adjudicating the alleged controversy would have required the trial court to become involved in complex health care matters concerning the staffing of skilled nursing and intermediate care facilities and assume regulatory functions of the State Department of Health Care Services (DHCS). In addition, granting and enforcing the requested relief would place an unnecessary burden on the trial court given the power of the DHCS to monitor and enforce compliance with section 1276.5.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Plaintiff's Complaint*

On February 11, 2004, Alvarado, by and through his successor in interest, Alex Alvarado, purporting to act as a private attorney general, filed a class action lawsuit against a number of defendants, including Sun Healthcare Group, Inc. (Sun), which owned or operated more than 20 skilled nursing and/or intermediate care facilities.[2] Alvarado alleged three causes of action:

---

[1] Unless otherwise indicated, unspecified statutory references are to the California Health and Safety Code.

[2] The other named defendants included: SunBridge Healthcare Corporation; Care Enterprises West, Inc.; Braswell Enterprises, Inc.; Brittany Rehabilitation Center, Inc.; Carmichael Rehabilitation Center; Coalinga Rehabilitation Center; Covina Rehabilitation Center; Fairfield Rehabilitation Center; Fullerton Rehabilitation Center; Glendora Rehabilitation Center; Grand Terrace Rehabilitation Center; Harbor View Rehabilitation Center; Heritage Rehabilitation Center; Huntington Beach Convalescent Hospital; Jackson Rehabilitation Center, Inc.; Meadowbrook Rehabilitation Center; Newport Beach Rehabilitation Center; Paradise Rehabilitation Center, Inc.; Rosewood Rehabilitation Center, Inc.; Shandin Hills Rehabilitation Center; Stockton Rehabilitation Center, Inc. and Vista Knoll Rehabilitation Center, Inc.

(1) unlawful business practice in violation of Business and Professions Code section 17200; (2) unfair and fraudulent business practice in violation of Business and Professions Code section 17200; and (3) false advertising in violation of Business and Professions Code section 17500.

In the complaint, Alvarado defined the purported class as follows: "[A]ll residents of skilled nursing facilities owned, operated and/or managed by [Sun] between February 1, 2000 through the date of the filing of this complaint wherein the defendants were reimbursed for services provided to 'class member' by private pay and/or privately acquired insurance and/or any HMO or PPO."

Alvarado alleged that defendants engaged in a pervasive and intentional failure to provide sufficient direct nursing care for the residents of the skilled nursing facilities. Alvarado further alleged that Sun received substantial profit by failing to comply with section 1276.5, subdivision (a).

Alvarado also alleged that defendants falsely advertised that they provided greater nursing levels than those actually provided. Finally, Alvarado alleged that defendants engaged in unlawful business practices by failing to maintain adequate levels of skilled nursing staff and by misrepresenting to residents and family members the level of staffing provided at the nursing centers.

### 2. *Sun Files a Demurrer*

Sun filed a demurrer and motion to strike. Sun asserted the trial court should abstain from adjudicating the action or defer to the primary jurisdiction of the DHCS. Sun further asserted that section 1276.5, subdivision (a), did not create a private cause of action.

### 3. *Alvarado's Opposition to the Demurrer*

In opposition, Alvarado asserted that section 1276.5, subdivision (a), created a private cause of action, the abstention doctrine did not apply, and the doctrine of primary jurisdiction was also inapplicable.

### 4. *Trial Court Sustains Demurrer Without Leave to Amend*

The trial court sustained Sun's demurrer without leave to amend. The trial court found that even if section 1276.5 permitted a private right of action, the court would nevertheless exercise its discretion to abstain from adjudicating the case. The trial court entered judgment in favor of all defendants. Alvarado timely filed a notice of appeal.

## STANDARD OF REVIEW

In this case, the trial court sustained the demurrer without leave to amend. Thus, we give the complaint a reasonable interpretation and treat the demurrer as admitting all material facts properly pled. (*Shamsian v. Department of Conservation* (2006) 136 Cal.App.4th 621, 631 [39 Cal.Rptr.3d 62] (*Shamsian*).) Because the trial court dismissed this case on the basis of the doctrine of judicial abstention, however, our standard of review is abuse of discretion. (*Id.* at p. 641 ["The trial court properly exercised its discretion to abstain from employing the remedies available under the unfair competition law."]; see also *Desert Healthcare Dist. v. PacifiCare, FHP, Inc.* (2001) 94 Cal.App.4th 781, 795 [114 Cal.Rptr.2d 623] (*Desert Healthcare*) ["Therefore, because the remedies available under the UCL, namely injunctions and restitution, are equitable in nature, courts have the discretion to abstain from employing them."].)

## ISSUE PRESENTED

The issue presented is whether the trial court abused its discretion by abstaining from adjudicating the alleged controversy.[3]

## DISCUSSION

Plaintiff contends that the trial court abused its discretion by dismissing this action on the basis of the equitable abstention doctrine. We disagree.

### 1. *The Abstention Doctrine*

#### a. *Introduction*

■ Plaintiff seeks relief under the UCL. In California, the remedies available for alleged violations of the UCL include injunctions and restitution. Because these remedies are equitable in nature, under the doctrine of judicial abstention, courts have the discretion to abstain from employing them. (*Desert Healthcare, supra,* 94 Cal.App.4th at p. 795.)

---

[3] The parties raise a number of issues which we do not address, including: (1) Alvarado's standing; (2) whether section 1276.5, subdivision (a), created a private cause of action; and (3) whether the doctrine of primary jurisdiction applied. In addition, we express no opinion as to whether a district attorney can pursue litigation against skilled nursing and intermediate care facilities for alleged violations of section 1276.5, subdivision (a).

There are various theories underlying the application of judicial abstention in UCL lawsuits. Courts may abstain when the lawsuit involves determining complex economic policy, which is best handled by the Legislature or an administrative agency. (*California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205, 218 [27 Cal.Rptr.2d 396] (*California Grocers*).) Judicial abstention is appropriate in cases where granting injunctive relief would be unnecessarily burdensome for the trial court to monitor and enforce given the availability of more effective means of redress. (*Diaz v. Kay-Dix Ranch* (1970) 9 Cal.App.3d 588, 599 [88 Cal.Rptr. 443] (*Diaz*).) Courts may also abstain when federal enforcement of the subject law would be " 'more orderly, more effectual, less burdensome to the affected interests.' " (*People ex rel. Dept. of Transportation v. Naegele Outdoor Advertising Co.* (1985) 38 Cal.3d 509, 523 [213 Cal.Rptr. 247, 698 P.2d 150], quoting *Diaz, supra*, 9 Cal.App.3d 588, 599.)

> b.  *Application of the Abstention Doctrine in UCL Cases*
>
> > (i)  *Certain Complex Economic Policies and Issues Should Be Handled by the Legislature or Administrative Agencies*

■ Judicial intervention in areas of complex economic policy is inappropriate. (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1168, fn. 15 [278 Cal.Rptr. 614, 805 P.2d 873].) The Courts of Appeal have "neither the power nor the duty to determine the wisdom of any economic policy; that function rests solely with the legislature." (*Max Factor & Co. v. Kunsman* (1936) 5 Cal.2d 446, 454 [55 P.2d 177].)

■ Judicial abstention is appropriate when granting the requested relief would require a trial court to assume the functions of an administrative agency, or to interfere with the functions of an administrative agency. (*Shamsian, supra*, 136 Cal.App.4th at p. 642; *Samura v. Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284, 1301–1302 [22 Cal.Rptr.2d 20] (*Samura*).)

In *Samura*, the plaintiff sued Kaiser and others for injunctive relief pursuant to the UCL. (*Samura, supra*, 17 Cal.App.4th at p. 1288.) The plaintiff alleged that Kaiser's third party liability provisions in service agreements violated the UCL. These provisions provided, inter alia, that if a member received medical services under the service agreement for injuries caused by a third party, and the member recovered a settlement or judgment

as compensation, the member would pay for the medical services from the settlement or judgment. (17 Cal.App.4th at p. 1289.) Following a trial, the trial court granted the plaintiff injunctive relief, requiring Kaiser, among other things, to rewrite and clarify in plain English the third party liability provisions. (*Id.* at p. 1291.)

The *Samura* Court of Appeal reversed, concluding that the trial court erred when it tried to enforce compliance with the "regulatory guidelines and requirements of the Knox-Keene Act." (*Samura, supra,* 17 Cal.App.4th at p. 1301.) The court stated as follows: "It is immaterial whether or not the challenged contract provisions and business practices comply with these portions of the Knox-Keene Act because the statutes do not define unlawful acts that may be enjoined under Business and Professions Code section 17200. In basing its order on these provisions, the trial court assumed a regulatory power over Health Plan that the Legislature has entrusted exclusively to the Department of Corporations. Samura unquestionably has certain remedies if the Department of Corporations fails to discharge its responsibilities under the Knox-Keene Act [citation], but the courts cannot assume general regulatory powers over health maintenance organizations through the guise of enforcing Business and Professions Code section 17200. [Citation.] To the extent that the order on appeal is based on portions of the Knox-Keene Act having a purely regulatory import, it improperly invades the powers that the Legislature entrusted to the Department of Corporations." (*Id.* at pp. 1301–1302, fn. omitted.)

In *California Grocers*, the California Grocers Association filed suit against Bank of America to challenge a $3 banking fee for a check processing service as a violation of the UCL. (*California Grocers, supra,* 22 Cal.App.4th at pp. 209–211.) The trial court found that the fee was unconscionably high, a violation of the covenant of good faith and fair dealing, and thus an unfair business practice under the UCL. The court granted injunctive relief, limiting the fee to $1.73, which represented the bank's cost plus a 15 percent markup for profit. (*California Grocers, supra,* 22 Cal.App.4th at p. 212.)

The Court of Appeal reversed. The court concluded that the fee was not unconscionable. (*California Grocers, supra,* 22 Cal.App.4th at p. 215.) Alternatively, as a separate ground for reversing the judgment, the Court of Appeal concluded that injunctive relief was "an inappropriate exercise of judicial authority." (*Id.* at p. 217.) The court explained that the case involved

a question of economic policy, that is, whether service fees charged by banks were too high and should be regulated. The court stated that determining economic policy was primarily a legislative and not a judicial function. (*Id.* at p. 218.)

In *Lazzareschi Inv. Co. v. San Francisco Fed. Sav. & Loan Assn.* (1971) 22 Cal.App.3d 303 [99 Cal.Rptr. 417], the court addressed the legality of a mortgage loan prepayment charge. That court stated, "[T]he control of charges, if it be desirable, is better accomplished by statute or by regulation authorized by statute than by *ad hoc* decisions of the courts. Legislative committees and an administrative officer charged with regulating an industry have better sources of gathering information and assessing its value than do courts in isolated cases." (*Id.* at p. 311.)

In *Wolfe v. State Farm Fire & Casualty Ins. Co.* (1996) 46 Cal.App.4th 554 [53 Cal.Rptr.2d 878] (*Wolfe*), the court explained that following the 1994 Northridge earthquake, a number of residential real property insurers stopped or reduced the sales of homeowner policies because the insurers were required to provide earthquake insurance in those policies. The insurers were concerned about the risk they would be assuming and "their ability to pay all claims in case of another earthquake . . . ." (*Id.* at p. 560.)

Acting as a private attorney general, the plaintiff in *Wolfe* sued 17 residential real property insurers for injunctive relief to require the insurers to sell new policies. The plaintiff alleged that the failure to sell new policies constituted an unfair business practice under the UCL. (*Wolfe, supra,* 46 Cal.App.4th at p. 557.) The trial court sustained the insurers' demurrers without leave to amend on the basis that the issues in that case were best addressed by the Legislature. (*Id.* at p. 559.)

The Court of Appeal affirmed. The court explained that even if the plaintiff could state a cause of action for unfair trade practices based on Proposition 103, "that by itself [did] not permit unwarranted judicial intervention in an area of complex economic policy." (*Wolfe, supra,* 46 Cal.App.4th at p. 565.) The *Wolfe* court explained that judicial resolution of the complaint would involve the courts in microeconomic managing of the insurance industry. The court stated that to grant the requested injunctive relief would "necessarily involve the court in evaluating the potential risk being undertaken by each

individual homeowners/earthquake insurer and analyzing their respective financial conditions to determine whether they would remain sufficiently solvent to undertake those risks." (*Id.* at p. 567.)

In *Desert Healthcare, supra*, 94 Cal.App.4th 781, a hospital filed an action against a health service plan (PacifiCare) to recover medical expenses for services provided to members of the health service plan. Desert Physicians Association, the entity responsible on behalf of PacifiCare for reimbursing the hospital, had filed for bankruptcy. (*Id.* at p. 785.) The hospital sued for violations of the Knox-Keene Health Care Service Plan Act of 1975 (Health & Saf. Code, § 1340 et seq.), for negligence and for violations of the UCL. The Court of Appeal affirmed the order sustaining PacifiCare's demurrer without leave to amend with regard to the Knox-Keene and negligence causes of action. (94 Cal.App.4th at pp. 791–793.)

The *Desert Healthcare* court also found that the hospital had not stated a valid UCL claim, and even if it had, the court would not approve of "judicial intervention under the guise of the UCL . . . . " (*Desert Healthcare, supra*, 94 Cal.App.4th at p. 794.) The court explained: "Where a UCL action would drag a court of equity into an area of complex economic policy, equitable abstention is appropriate. In such cases, it is primarily a legislative and not a judicial function to determine the best economic policy." (*Id.* at p. 795.) The court explained that "[i]n order to fashion an appropriate remedy for such a claim, be it injunctive or restitutionary, the trial court would have to determine the appropriate levels of capitation and oversight. Such an inquiry would pull the court deep into the thicket of the health care finance industry, an economic arena that courts are ill-equipped to meddle in. As such, there is no proper role for the court of equity to play in the instant dispute." (*Id.* at p. 796.)

In the recent case of *Shamsian, supra*, 136 Cal.App.4th 621, the Court of Appeal affirmed an order dismissing the case on the basis of equitable abstention. There, the plaintiff filed a class action lawsuit against the Department of Conservation for allegedly failing to provide convenient, economical and efficient beverage container redemption opportunities as required by section 14501, subdivision (g), of the Public Resources Code and for unfair competition under the UCL. (*Shamsian, supra*, 136 Cal.App.4th at pp. 626–627.)

The *Shamsian* court held that Public Resources Code section 14501, subdivision (g), did not impose a mandatory duty on the Department of Conservation, and thus did not create a private cause of action. Alternatively, the court concluded that equitable abstention barred the plaintiff's UCL claims. (*Shamsian, supra,* 136 Cal.App.4th at p. 626.)

As to the doctrine of equitable abstention, the *Shamsian* court explained: "[T]he complex statutory arrangement of requirements and incentives involving participants in the beverage container recycling scheme is to be administered and enforced by the department consistent with the Legislature's goals. For the court at this point to issue restitution and disgorgement orders against the corporate defendants would interfere with the department's administration of the act and regulation of beverage container recycling and potentially risk throwing the entire complex economic arrangement out of balance. The public's need for opportunities to recover its cash redemption value funds and to conveniently recycle its beverage containers is not so great as to warrant judicial interference in the administrative scheme designed to address those needs at this point." (*Shamsian, supra,* 136 Cal.App.4th at p. 642.)

> (ii) *Granting Injunctions in Cases Involving Complex Economic Issues When Other Remedies Are Available Can Place an Unnecessary Burden on the Courts*

Courts may abstain from adjudicating a lawsuit and issuing injunctive relief when the injunctive relief would place an unnecessary burden on the court because of the existence of other, more effective remedies.

In *Diaz, supra,* 9 Cal.App.3d 588, the plaintiffs sought injunctive relief to prohibit ranchers from employing as farm workers illegal immigrants into the United States. In that case, the court concluded that the trial court should not become involved in issuing and enforcing injunctive relief when there was a more effective federal remedy. The court explained that a single trial court may have to issue dozens of injunctions, creating a network of injunctions to cover growers in rural counties. The trial courts would then have to enforce the injunctions through contempt hearings. (*Id.* at p. 599.) The court stated: "Thus, whatever the legal theory underlying the injunction, the court must compare the effects of granting and withholding it and, in that connection, consider the comparative availability and advisability of other forms of amelioration." (*Id.* at p. 593.)

With this understanding of the doctrine of equitable abstention, we turn to the issue of whether the trial court abused its discretion in the context of this case.

## 2. *Section 1276.5*

Adopted in 1976, section 1276.5 provides in pertinent part: "(a) The department shall adopt regulations setting forth the minimum number of equivalent nursing hours per patient required in skilled nursing and intermediate care facilities, subject to the specific requirements of Section 14110.7 of the Welfare and Institutions Code. *However, notwithstanding Section 14110.7 or any other provision of law, commencing January 1, 2000, the minimum number of actual nursing hours per patient required in a skilled nursing facility shall be 3.2 hours, except as provided in Section 1276.9.*

"(b)(1) For the purposes of this section, 'nursing hours' means the number of hours of work performed per patient day by aides, nursing assistants, or orderlies plus two times the number of hours worked per patient day by registered nurses and licensed vocational nurses (except directors of nursing in facilities of 60 or larger capacity) and, in the distinct part of facilities and freestanding facilities providing care for the developmentally disabled or mentally disordered, by licensed psychiatric technicians who perform direct nursing services for patients in skilled nursing and intermediate care facilities, except when the skilled nursing and intermediate care facility is licensed as a part of a state hospital, and except that nursing hours for skilled nursing facilities means the actual hours of work, without doubling the hours performed per patient day by registered nurses and licensed vocational nurses.

"(2) Concurrent with implementation of the first year of rates established under the Medi-Cal Long Term Care Reimbursement Act of 1990 . . . for the purposes of this section, 'nursing hours' means the number of hours of work performed per patient day by aides, nursing assistants, registered nurses, and licensed vocational nurses (except directors of nursing in facilities of 60 or larger capacity) and, in the distinct part of facilities and freestanding facilities providing care for the developmentally disabled or mentally disordered, by licensed psychiatric technicians who performed direct nursing services for patients in skilled nursing and intermediate care facilities, except when the skilled nursing and intermediate care facility is licensed as a part of a state hospital." (Italics added.)

### 3. *The Trial Court Did Not Abuse Its Discretion by Abstaining from Adjudicating the Alleged Controversy*

#### a. *Calculating Nursing Hours Per Patient Would Require the Trial Court to Undertake Regulatory Powers Which Would Be Better Performed by the DHCS*

Adjudicating this class action controversy would require the trial court to assume general regulatory powers over the health care industry through the

guise of enforcing the UCL, a task for which the courts are not well equipped. (*Samura, supra,* 17 Cal.App.4th at pp. 1301–1302.)

█ Section 1276.5, subdivision (a) is a regulatory statute, which the Legislature intended the DHCS to enforce. We conclude this based upon the wording of section 1276.5, subdivision (a), and its surrounding statutory framework. (*Phelps v. Stostad* (1997) 16 Cal.4th 23 [65 Cal.Rptr.2d 360, 939 P.2d 760] (*Phelps*).)[4]

With regard to the wording of the statute, the first sentence of subdivision (a) indicates that the Legislature intended the DHCS to promulgate regulations pursuant to section 1276.5. Subdivision (a) provides in pertinent part: "*The department shall adopt regulations* setting forth the minimum number of equivalent nursing hours per patient required in skilled nursing and intermediate care facilities." (Italics added.)

In addition, section 1276.5 is contained in an article of the Health and Safety Code entitled "Regulations." With limited exceptions, each statute contained in the article directs the DHCS (or another state agency) to prioritize existing regulations, adopt new regulations or standards, enforce regulations, or ensure that certain health care providers operate in compliance with appropriate license requirements and agency rules and regulations. Notably, the first statute contained in the article, section 1275, begins with the following mandate: "The state department shall adopt, amend, or repeal . . . any reasonable rules and regulations as may be necessary or proper to carry out the purposes and intent of this chapter and to enable the state department to exercise the powers and perform the duties conferred upon it by this chapter, not inconsistent with any statute of this state."

The surrounding statutory framework confirms that the Legislature intended the DHCS to enforce section 1276.5, subdivision (a). Section 1294 is

---

[4] The *Phelps* court explained: " 'A fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citations.] In construing a statute, our first task is to look to the language of the statute itself. [Citation.] When the language is clear and there is no uncertainty as to the legislative intent, we look no further and simply enforce the statute according to its terms. [Citations.] [¶] Additionally, however, we must consider the [statutory language] in the context of the entire statute [citation] and the statutory scheme of which it is a part. "We are required to give effect to statutes 'according to the usual, ordinary import of the language employed in framing them.' [Citations.]" [Citations.] " 'If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose.' [Citation.] . . . . 'When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear.' [Citations.] Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole. [Citations.]" ' " (*Phelps, supra,* 16 Cal.4th at p. 32.)

contained in the same chapter of the Health and Safety Code as section 1276.5. Section 1294 provides in pertinent part: "The state department may suspend or revoke any license or special permit issued under the provisions of this chapter upon any of the following grounds and in the manner provided in this chapter: [¶] (a) Violation by the licensee or holder of a special permit of any of the provisions of this chapter or of the rules and regulations promulgated under this chapter. [¶] . . . [¶] (c) Aiding, abetting, or permitting the violation of any provision of this chapter or of the rules and regulations promulgated under this chapter. [¶] (d) Conduct inimical to the public health, morals, welfare, or safety of the people of the State of California in the maintenance and operation of the premises or services for which a license or special permit is issued."

In addition, the DHCS is better equipped to determine compliance with the statute. Section 1276.5, subdivision (a), requires that a skilled nursing facility must provide a minimum of 3.2 nursing hours per patient day. However, subdivision (a) contains an exception, referring to section 1276.9, subdivision (a), which states that "[a] special treatment program service unit distinct part shall have a minimum 2.3 nursing hours per patient per day." Subdivision (b) of section 1276.9 defines a " 'special treatment program service unit distinct part' " as "an identifiable and physically separate unit of a skilled nursing facility or an entire skilled nursing facility that provides therapeutic programs to an identified mentally disordered population group." Further complicating matters, subdivision (d) of section 1276.9 provides: "A special treatment program service unit distinct part shall also have an overall average weekly staffing level of 3.2 hours per patient per day, calculated without regard to the doubling of nursing hours, as described in paragraph (1) of subdivision (b) of Section 1276.5, for the special treatment program service unit distinct part."

Thus, to enforce section 1276.5, subdivision (a), the initial task for the trial court would be to determine on a classwide basis whether a particular skilled nursing or intermediate care facility is governed by section 1276.5 or 1276.9.

The next task for the trial court would be to calculate nursing hours for each facility involved in this case. Subdivision (b) of section 1276.5 identifies various health care professionals whose hours may be counted towards the 3.2 nursing hours per patient day requirement. Thus, adjudicating this class action controversy would require the trial court to classify employees into different categories including aides, nursing assistants, orderlies, registered nurses, licensed vocational nurses, directors of nursing and licensed psychiatric technicians who perform direct nursing services. Once the court classified the various employees, it would then be required to calculate the hours they worked.

In addition, section 1276.5, subdivision (b) provides different formulas for calculating nursing hours in different skilled nursing facilities. Thus, the court would have to determine on a classwide basis the size, configuration and licensing status of skilled nursing and intermediate care facilities. For example, the court would have to determine whether the facility accommodated 60 or more patients, whether a distinct part of a facility or free-standing facility provided care for developmentally disabled or mentally disordered persons, and whether the facility was licensed as a part of a state hospital.

■ We find that calculating on a classwide basis whether skilled nursing or intermediate facilities are in compliance with section 1276.5, subdivision (a), or section 1276.9, subdivision (a) or (d), is a task better accomplished by an administrative agency than by trial courts.

### b. *To Grant the Requested Injunctive Relief Would Be Unnecessarily Burdensome for the Trial Court*

Courts may abstain when an administrative agency is better equipped to provide an alternative and more effective remedy. (*Diaz, supra,* 9 Cal.App.3d at p. 599.)

If the trial court were to adjudicate this case, it would have to decide whether to issue networks of injunctions across the State of California. If it did issue those injunctions, it would have to monitor and enforce them. As explained, there are numerous variables for determining whether a particular skilled nursing or intermediate care facility is providing 3.2 nursing hours per patient day. Thus, granting the requested injunctive relief would place a tremendous burden on the trial court to undertake a classwide regulatory function and manage the long-term monitoring process to ensure compliance with section 1276.5, subdivision (a).

The DHCS has the power, expertise and statutory mandate to regulate and enforce section 1276.5. Given this alternative and more effective means of ensuring compliance with section 1276.5, we conclude the trial court did not abuse its discretion by applying the abstention doctrine.[5]

---

[5] Nothing in this opinion is intended to preclude plaintiff from pursuing appropriate writ relief pursuant to the Code of Civil Procedure to compel the DHCS to adopt regulations pursuant to the first sentence of section 1276.5, subdivision (a), or to enforce the requirement that "the minimum number of actual nursing hours per patient required in a skilled nursing facility shall be 3.2 hours, except as provided in Section 1276.9."

## DISPOSITION

The judgment is affirmed. Defendant Sun is to recover costs on appeal.

Klein, P. J., and Croskey, J., concurred.