[No. B206788. Second Dist., Div. Four. Sept. 23, 2009.]

JOSHUA MORGAN et al., Plaintiffs and Appellants, v.
AT&T WIRELESS SERVICES, INC., Defendant and Respondent.

COUNSEL

Kirtland & Packard and Robert K. Friedl for Plaintiffs and Appellants.

Eagan O'Malley & Avenatti, John C. O'Malley; Call, Jensen & Ferrell and Lisa A. Wegner for Defendant and Respondent.

OPINION

**WILLHITE, Acting P. J.**—This appeal involves a consumer class action alleged against defendant AT&T Wireless Services, Inc. (AT&T),[1] based upon AT&T's marketing and sale of premium cell phones that operated on a wireless network that AT&T allegedly modified in a manner that rendered those premium cell phones essentially useless. What started as a 13-page original complaint alleging causes of action under the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.), the false advertising law (FAL) (Bus. & Prof. Code, § 17500 et seq.), the Consumers Legal Remedies Act (CLRA) (Civ. Code, § 1750 et seq.), and for fraud and declaratory relief, morphed into a 47-page third amended complaint (alleging the same causes of action), after the trial court sustained AT&T's successive demurrers on the ground that the complaint lacked the requisite specificity. Finding the plaintiffs' theory of recovery obscured by extraneous allegations in the third amended complaint, and concluding that plaintiffs still failed to identify with particularity any actionable misrepresentations made by AT&T, the trial court sustained AT&T's demurrer to the third amended complaint without leave to amend.

Plaintiffs Joshua Morgan and George Shannon appeal, arguing that the complaint alleges cognizable claims and that they pleaded their claims with as much specificity as is required under the circumstances of this case. While we agree with the trial court that plaintiffs' claims are somewhat obscured by extraneous allegations, we hold that plaintiffs have alleged sufficient facts to state causes of action against AT&T under the UCL and the CLRA, and for fraud. We also hold, however, that plaintiffs have failed to allege facts to establish they have standing to bring their FAL cause of action under the theory they allege, and that they failed to raise any issue on appeal as to their claim for declaratory relief. Accordingly, we affirm the dismissal of the FAL and declaratory relief causes of action and reverse the judgment of dismissal as to the remaining causes of action.

---

[1] AT&T Wireless Services, Inc., has undergone several name changes during the course of this litigation.

## BACKGROUND

A. *Original and First Amended Complaints*

The original complaint in this class action lawsuit was filed by Lindsey J. Bayman (who is not a party to this appeal) in July 2004. Although somewhat short of specifics, Bayman's complaint provided the general framework for her claims. She alleged that, at some unspecified time, AT&T advertised and sold the Sony Ericsson T68i (the T68i), a premium cell phone that sold for $300 to $500, and justified its high price by the fact that the T68i could make and receive calls around the world and had other advanced technologies. She alleged that, at the time AT&T advertised and sold the T68i, it had no intention to continue to support and service the T68i, and had decided "to modify its system in a manner that would substantially degrade service to users" of the T68i, which rendered the phones worthless. Finally, she alleged that, "in an attempt to surreptitiously 'phase out' these worthless premium phones without paying any compensation to the purchasers, or providing them with a new phone of equal capabilities and compatible with the changes made to their system," AT&T sent T68i users a free replacement cell phone, which AT&T said was an "upgrade"; in fact, it was a $20 phone that could not operate around the world and did not have many of the advanced technologies that the T68i had.

Based upon these factual allegations, Bayman asserted causes of action for violations of the UCL, FAL, and CLRA, and for fraud and declaratory relief, and sought injunctive and declaratory relief, restitution, damages, and punitive damages for herself and the putative class. The complaint made clear, however, that no damages were sought under the CLRA. Instead, the CLRA cause of action included the following language in bold: "Notice Pursuant to Civil Code 1782 [¶] Plaintiff hereby demands that within 30 days from service of this Complaint, defendants correct, repair, replace or otherwise rectify the deceptive practices complained of herein for the entire class pursuant to California Civil Code Section 1770. Failure to do so will result in Plaintiff amending this Complaint to seek damages for such deceptive practices pursuant to California Civil Code Section 1782."

AT&T removed the action to federal court on diversity grounds, and on the ground that Bayman's claims were governed by the federal Communications Act of 1934 (47 U.S.C. § 151 et seq.). In its notice of removal, AT&T succinctly summarized Bayman's claims: "Bayman claims that [AT&T] upgraded its Wireless Communications Services Network (the 'WCSN') without compensating customers who had purchased certain telephones that were allegedly incompatible with the post-upgraded WCSN." The federal district court granted Bayman's motion to remand the case back to state court.

Following remand, a first amended complaint was filed that was virtually identical to the original complaint, except that it added as additional named plaintiffs Morgan and Shannon (the appellants here). The trial court subsequently granted Bayman's request to be dismissed as a named plaintiff. AT&T then moved to compel arbitration. The motion was denied, and AT&T appealed from the denial. Six months later, AT&T voluntarily dismissed its appeal and filed a demurrer to the first amended complaint—a year after the original complaint was filed.

AT&T's demurrer challenged all of the claims on the ground that they were not pled with specificity.[2] AT&T also argued that the CLRA provided the exclusive remedy for the conduct alleged, and therefore all of the other claims must be dismissed. At the hearing on the demurrer, the trial court announced its tentative decision to sustain the demurrer with leave to amend, on the ground that the complaint lacked specificity. The court explained that the complaint needed to allege what misrepresentations were made, when they were made, and who made them; what features the replacement cell phone lacked and what features on the original premium phones no longer worked; to the extent plaintiffs were relying upon suppression of facts, what facts established that AT&T had a duty to disclose; and to the extent AT&T made an implied promise to support the T68i for a reasonable time, how that implied promise was breached.

## B. *Second Amended Complaint*

In September 2006, plaintiffs filed a second amended complaint that elaborated on the facts alleged in the earlier complaints. The complaint alleged the following facts applicable to all causes of action:

—AT&T advertised the T68i as its premium phone and sold it in a box bearing the AT&T logo. The box described some of the features of the T68i, including that it operated on frequencies used in North America and internationally and that it had Bluetooth technology. The box also stated that the phone could only operate with wireless services provided by AT&T. In addition, AT&T stated on the box that "[t]oday and tomorrow, our commitment is to deliver new technologies plus innovative products and services for all your wireless communications needs."

—Consumers who bought the T68i were required to purchase a wireless services plan from AT&T for a minimum of one year, but AT&T encouraged consumers to commit to more than one year by reducing the price for a T68i

---

[2] AT&T also argued that the CLRA claim was defective because plaintiffs had not filed an affidavit regarding venue, as required under the CLRA. Morgan subsequently filed the required affidavit.

purchased with a multiple-year service plan. Morgan committed to a two-year service plan in order to reduce the price of the T68i, and Shannon committed to a one-year service plan.

—"A short time" after plaintiffs bought their T68i phones, AT&T sent them a free T226[3] cell phone, which AT&T stated was an "upgrade" from the T68i. The booklet that accompanied the T226 gave instructions for transferring data from the T68i to the T226, and instructed the recipients to send their T68i phones to Sony Ericsson, the manufacturer of both the T68i and the T226.

—The T226 lacked certain identified features that the T68i had, including Bluetooth capability and the capability to send and receive calls internationally, and had a retail value of approximately $19.

—At the time AT&T advertised and sold the T68i, which operated on AT&T's 1900 MHz network system, AT&T did not intend to support that network system and instead intended to develop, expand, and support its 850 MHz network system. As a result of AT&T's withdrawal of support, the 1900 MHz network system became more and more degraded, and T68i owners experienced increased dropped calls, decreased service areas, and increased areas of no service, rendering the T68i essentially unusable.

—Consumers who accepted the "upgrade" to the T226 and returned their T68i were harmed because they were left with an inferior phone that did not have the features that justified the high price of the T68i, and consumers who kept their T68i were harmed because they were left with a phone that was rendered obsolete due to the degraded 1900 MHz network system.

In setting out their cause of action under the UCL, plaintiffs incorporated by reference the preceding allegations, and specifically alleged that AT&T's statements that it was committed to providing for all of its customers' wireless needs "today and tomorrow" and the fact that it held itself out as the world's leading provider of wireless communications services, combined with its sale of expensive T68i phones that required service contracts for one, two, or more years, would lead the average consumer to believe that AT&T was committed to providing for at least two years (or for the life of the T68i) support and development of the 1900 MHz network system so that the T68i could be operated in North America. Plaintiffs also alleged that AT&T deceived T68i customers by sending them an inferior T226 phone while calling it an upgrade in order to "surreptitiously recall the T68i by inducing T68i owners to mail back their expensive T68i phones."

---

[3] The second amended complaint sometimes refers to the replacement phone as a "T226" and at other times refers to it as a "T266." We will refer to it as a T226.

The causes of action under the FAL and the CLRA and for declaratory relief did not add any additional factual allegations, although plaintiffs alleged in the CLRA cause of action that they gave notice of the alleged violation in the original and first amended complaints in accordance with Civil Code section 1782, and therefore they now sought damages under Civil Code section 1780.[4]

The fraud cause of action alleged both a failure to disclose and an affirmative misrepresentation. In asserting failure to disclose, plaintiffs alleged that (1) AT&T represented that consumers could purchase a T68i "world phone" with advanced features for exclusive use on AT&T's 1900 MHz network if they agreed to commit to pay for AT&T wireless services for at least one or two years; (2) AT&T concealed that it did not intend to service, maintain, develop, and expand the 1900 MHz network; (3) AT&T had a duty to disclose this fact because the undisclosed fact was material to the transaction and because nondisclosure would mislead the consumer to believe that, by purchasing the T68i and committing to pay for wireless services for a period of years, the consumer would be able to use the T68i for a period of years; (4) AT&T concealed the fact in order to defraud plaintiffs and the class; and (5) had plaintiffs and the class known that the 1900 MHz network would be degraded, they would not have purchased the T68i from AT&T. In asserting affirmative misrepresentation, plaintiffs alleged that (1) AT&T falsely represented that it was committed to providing services for all of the wireless communications needs of T68i purchasers, and that "[p]laintiffs and/or members of the class" relied upon those representations in purchasing the T68i; and (2) AT&T falsely represented that the T226 was an upgrade of the T68i in order to induce T68i owners to mail back their T68i phones, and that "[p]laintiffs and/or members of the [c]lass" relied upon that representation in sending back their T68i phones.

Although the second amended complaint provided many of the details that the trial court noted were missing from the first amended complaint, it did not allege when the alleged representations about the T68i or AT&T's commitment to provide service were made, when plaintiffs bought their T68i phones and AT&T service plans, when the T226 replacement phones were sent, or when the T68i phones became unusable.

AT&T once again demurred to the complaint on the ground that it failed to plead any of the claims with specificity. In addition, AT&T argued that the UCL and FAL claims were deficient because plaintiffs could not meet the

---

[4] As discussed in more detail below, Civil Code section 1782 provides that a notice of a violation of the CLRA and a demand for correction, repair, or replacement must be sent to the defendant at least 30 days before a plaintiff may bring a claim for damages under Civil Code section 1770.

standing requirements under Proposition 64 (which amended the UCL and FAL standing requirements in November 2004, after the original complaint was filed in this action), and that all but the CLRA claim failed to state a claim because the CLRA provides the exclusive remedy for the conduct alleged. Concurrently with its demurrer, AT&T filed a motion to strike the claim for damages in the CLRA cause of action, on the ground that plaintiffs failed to comply with the notice requirement of Civil Code section 1782.

In January 2007, the trial court sustained the demurrer with leave to amend on the grounds that (1) plaintiffs failed to plead critical dates, such as when they purchased their T68i phones, when they could no longer use the phones, and when they received the replacement phones; (2) plaintiffs failed to show they had standing under Proposition 64; (3) the fraud claim required more particularity; and (4) plaintiffs needed to comply with the CLRA notice requirement.

## C. *Third Amended Complaint*

Plaintiffs filed a third amended complaint—the complaint at issue in this appeal—in May 2007. Although this complaint alleged the same causes of action and the same theories of liability as the previous complaints, it included considerably more detail.

### 1. *General Facts*

In amending the complaint, plaintiffs added allegations of both general background facts and specific representations allegedly made by AT&T and its representatives. Some of those more detailed allegations include:

—Information about wireless networks and the development of AT&T's networks.[5]

—Excerpts from press releases AT&T issued from January 2002 through May 2003, as well as advertisements that appeared on the AT&T Web site in

---

[5] According to the complaint, AT&T used to provide wireless voice and data services over a network that used TDMA (time division multiple access) as its signal transmission technology, but in July 2001 it launched a new network using GSM (global system for mobile communication) signal transmission technology for voice services and GPRS (general packet radio services) for data services. Although GSM networks in other countries operate in the 900 or 1800 MHz bands, in the United States they operate in the 850 or 1900 MHz bands. AT&T launched its GSM network in the 1900 MHz band.

August through December 2002, in which AT&T touted its new and expanding GSM/GPRS network and the capabilities of the phones it sold to operate on that network, including the T68i.[6]

—An excerpt from a document AT&T filed with the Securities and Exchange Commission in which AT&T explained that its GSM network had been transmitting at 1900 MHz on towers that were spaced for TDMA systems at 850 MHz, which caused "a decreased level of network quality." To improve quality, AT&T reported that it was "upgrading" its cell sites with new 850 MHz GSM equipment, and had completed 40 percent of its planned 850 MHz upgrade by the end of 2003. Plaintiffs asserted that the T68i became essentially unusable because it could not operate on an 850 MHz network.

—Excerpts from a postcard AT&T sent T68i owners announcing that AT&T was sending them free T226 phones, which AT&T represented was an "upgrade," and excerpts from the booklet that accompanied the T226 phones, which AT&T started sending to T68i owners in February 2004.

### 2. *Allegations Regarding Plaintiffs*

In addition to these facts, the complaint also included more detailed information about the named plaintiffs' experiences with the T68i and AT&T.

For example, the complaint alleged that, before September 2002, Morgan conducted Internet research on Web sites that regularly published AT&T press releases and Internet advertisements, and had discussions with other consumers who received information about the T68i from AT&T. Through his research and discussions, he learned of the capabilities of the T68i (including that it had Bluetooth capability and would operate around the world), and of AT&T's GSM/GPRS network. Based on his research and discussions, he decided to purchase a T68i from AT&T. He understood from AT&T's representations that the T68i would be supported by AT&T's GSM/GPRS network and that AT&T would continue to maintain and improve the network.

Morgan went to an AT&T store in September 2002, where he was subjected to further representations regarding the capabilities of the T68i and

---

[6] The complaint also alleged that AT&T also engaged in print and broadcast media advertising and in-store advertising concerning its expanding GSM/GPRS network and the capabilities of the T68i during this time, but plaintiffs were unable to allege the specific content of that advertising because AT&T failed to preserve or produce the advertisements. Plaintiffs alleged, however, that the effect of those advertisements was to cause the average consumer to understand that AT&T's network would support the T68i for the life of the phone.

AT&T's GSM/GPRS network. He decided to buy a T68i from AT&T as a result of AT&T's representations that the phone would be supported by the AT&T GSM/GPRS network and that the network would be maintained and improved. He also agreed to a two-year service plan that allowed him to use the T68i on AT&T's network for a minimum of two years, with an automatic month-to-month renewal thereafter, which would allow him access to the network for the life of the phone.

As a result of AT&T's representations, Morgan understood that AT&T's GSM/GPRS network would support the T68i for the life of the phone. By January 2004, however, reception to the T68i was rapidly degrading, and he regularly was unable to make or receive calls due to poor reception; by February 2004 the T68i was essentially useless. After Morgan received his free T226 from AT&T, he went back to the AT&T store and offered to give back both the T68i and the T226 (which did not have the features the T68i had) if AT&T would give him a phone comparable to the T68i that was compatible with AT&T's network. AT&T refused.

With regard to Shannon, the complaint alleged that he wanted to buy a cell phone that could be used internationally because he frequently travelled overseas as an officer in the United States Navy Reserves. He researched the GSM network and phones that worked on the GSM network, and, as a result of that research and his exposure to statements made by AT&T in its advertisements and press releases, he decided to buy the T68i from AT&T.

On February 9, 2003, he went into an AT&T store to buy two T68i phones, one for himself and one for his wife. Although he knew that the GSM network was new and that "coverage was spotty" at that time, he was told that the network was expanding and would improve. In addition to buying two T68i phones, he also agreed to a one-year service plan with an automatic month-to-month renewal for each of the phones, which would allow him access to the network for the life of the phones. Within a week after buying the phones, however, he returned to the AT&T store to complain about the poor reception. Although he considered returning the phones at that time, which was within the return period, he decided to keep them after the AT&T representative told him that AT&T was still expanding the network, and that coverage and service would improve in the future.

He received a free T226 replacement phone from AT&T in March 2004, but because it did not have the features or capabilities of the T68i, he signed a petition asking AT&T for an appropriate replacement phone. AT&T did not respond to the petition. Since then, he has tried intermittently to use the T68i, but it does not have any signal at his place of work and only a weak signal in other places.

### 3. Extraneous Allegations

In addition to the above allegations, the amended complaint also added more than 16 pages of allegations related to AT&T's purported suppression and/or spoliation of evidence, and asserted that certain adverse inferences may be made against AT&T under Evidence Code section 413. These allegations add nothing to the causes of action alleged.

### 4. Causes of Action

#### a. UCL

In stating their UCL cause of action, plaintiffs alleged that AT&T inundated the Internet and other media with representations about the features of the T68i and AT&T's GSM/GPRS network (some of which are quoted in the complaint) in order to induce plaintiffs and members of the class to purchase T68i phones from AT&T that operated exclusively on the AT&T network. Plaintiffs alleged that the effect of AT&T's press releases and advertising was to cause the average consumer to understand that a T68i phone purchased from AT&T would be supported by the AT&T network for the life of the phone.

The complaint alleged that AT&T's conduct violated the UCL because it was unlawful, unfair, and fraudulent. Plaintiffs alleged it was unlawful because it violated the CLRA. They alleged it was unfair for two reasons. First, it was unfair because AT&T's representations and sale of the T68i caused consumers, including plaintiffs, to form legitimate expectations that AT&T would maintain the network in a manner that would continue to support or improve the operation of the T68i throughout the life of the phone, but instead AT&T chose to expand the network in a manner that rendered the T68i essentially inoperable on the network. It also was unfair because, although AT&T recognized its obligation to provide T68i owners with replacement phones so they could continue to utilize their service plans with AT&T, AT&T tried to pass off the T226 as an "upgrade" when it was not, and refused to provide T68i owners with replacement phones that had features similar to the T68i. Finally, plaintiffs alleged that AT&T's conduct was fraudulent within the meaning of the UCL because (1) members of the public were likely to be deceived; (2) plaintiffs and members of the class had an expectation that AT&T would provide reliable service on the network for the life of the phone if they bought a T68i from AT&T; (3) plaintiffs and members of the class had an expectation that the T68i's reception would improve, not degrade, as AT&T expanded and enhanced its GSM/GPRS network; (4) AT&T made specific representations about the features of the T68i but failed to inform purchasers that the phone would become obsolete

and unusable in the United States; and (5) AT&T sent T68i purchasers a T226 replacement phone and misrepresented it as an "upgrade" to induce some purchasers to return their T68i phones.

In addition, the complaint alleged that AT&T's conduct constituted unfair advertising within the meaning of the UCL in that AT&T engaged in widespread promotional activity directed at the public at large that was likely to deceive, and did deceive, members of the public at large.[7]

Finally, the complaint alleged that plaintiffs suffered injury in fact and had lost money or property as a result of AT&T's conduct because they each paid money to purchase the T68i from AT&T, and they each lost possession or use of their T68i because AT&T's conduct rendered their phones useless and obsolete.

b. *FAL*

The FAL cause of action alleged that AT&T's February 2004 offer to T68i owners of a "free upgrade" T226 phone was untrue or misleading, and AT&T knew or should have known it was untrue or misleading, because the T226 did not have international capabilities or other advanced features. Plaintiffs alleged that members of the class were induced to return their T68i phones as a result of AT&T's offer, and that AT&T should be enjoined from attempting to induce consumers to exchange their phones for phones of lesser cost or quality.

c. *CLRA*

The CLRA cause of action alleged that AT&T's conduct violated several provisions of Civil Code section 1770, subdivision (a), and that plaintiffs gave notice of these alleged violations to AT&T on January 19, 2007 (more than 30 days before filing the third amended complaint) in accordance with Civil Code section 1782.[8] Plaintiffs sought damages and punitive damages on behalf of the class, as well as injunctive relief.

d. *Fraud*

In the fraud cause of action, plaintiffs alleged that AT&T inundated the Internet and other media with specific statements about its GSM/GPRS network and the features and characteristics of the T68i phone. Plaintiffs

---

[7] We note that this claim of unfair advertising under the UCL is separate from the cause of action alleged under the FAL.

[8] The complaint alleged that plaintiffs also gave notice to AT&T by endorsing a petition that was sent to AT&T on April 24, 2004.

quoted several of those specific statements—including such statements as "AT&T Wireless will provide its customers with the benefits of seamless GSM coverage"; "[AT&T] would continue to extend and enhance the [GSM/GPRS] network over the coming year"; "[the T68i phone] feature(s) a color screen and Bluetooth™ wireless technology"; and "[the T68i phone] will allow customers to use their wireless phone domestically or when traveling abroad"—and listed some of the people who made the statements.

Plaintiffs alleged that, based on AT&T's statements and advertisements, a reasonable customer who purchased a T68i phone from AT&T for use on its GSM/GPRS network would understand that he would have a phone with the T68i's features and capabilities that would be supported by AT&T's GSM/GPRS network for the life of the phone. They alleged that AT&T failed to disclose that it was going to develop and expand its GSM/GPRS network in a manner that degraded service to the T68i, rendering the T68i so unusable that it would have to be replaced. They asserted that AT&T had a duty to disclose this information because, without the information, AT&T's advertisements and statements were likely to mislead (and did mislead) the public, and that AT&T intentionally concealed or suppressed the information with the intent to defraud. Finally, plaintiffs alleged that had they and the class not been deceived by AT&T's assertions and suppression of facts, they would not have purchased the T68i from AT&T.

In addition to these allegations of failure to disclose, plaintiffs alleged (1) that AT&T's statements constituted promises, which AT&T did not intend to perform; and (2) that AT&T's assertion that the T226 was an "upgrade" was untrue, that AT&T had no reasonable basis to believe it was true, that AT&T made the assertion with the intent to induce plaintiffs and class members to alter their position to their detriment by returning their T68i phones, and that some class members relied upon the assertion in returning their T68i phones.

### e. *Declaratory Relief*

In their declaratory relief claim, plaintiffs merely alleged that an actual controversy existed between plaintiffs and the putative class on the one hand, and AT&T on the other hand, concerning their respective rights and duties. Plaintiffs asked for a court determination of the rights of plaintiffs and the class and the corresponding rights of AT&T.

### 5. *Demurrer and Motion to Strike*

AT&T filed a demurrer to the third amended complaint, along with a motion to strike portions of the complaint, including the CLRA damages claim. In its demurrer, AT&T challenged plaintiffs' fraud claim on the

grounds that (1) AT&T's statement that the T226 was an "upgrade" was not actionable because it was "puffery" or a statement of opinion; (2) the statements about the GSM/GPRS network were not actionable because they were not false when they were made and they were representations of future events; and (3) the representations about the GSM/GPRS network were not alleged with specificity, nor did plaintiffs allege how they justifiably relied on them. AT&T challenged the UCL and FAL claims on the grounds that (1) plaintiffs failed to establish Proposition 64 standing; (2) plaintiffs failed to allege any unfair, unlawful, or fraudulent conduct; and (3) the CLRA provides the exclusive remedy for the conduct alleged. Finally, AT&T challenged the declaratory relief claim on the ground that it was derivative of plaintiffs' other claims. We note that, although AT&T included a general demurrer and a special demurrer (on the ground of uncertainty) to the CLRA claim, it did not address the merits of the CLRA claim in the memorandum of points and authorities in support of the demurrer. Instead, in a separate motion AT&T moved to strike the CLRA claim for damages on the ground that plaintiffs did not comply with the Civil Code section 1782 notice provisions before filing their lawsuit.[9]

### 6. Trial Court's Ruling

On October 16, 2007, the trial court issued a written ruling on the demurrer and motion to strike. The court pointed out that the operative complaint included so much extraneous matter that it was difficult to determine what plaintiffs' theory was, and which allegations supported that theory. Nevertheless, it observed that plaintiffs appeared to allege that AT&T "guaranteed their network would support the T68i 'for the life of the phone' " or that AT&T "promised that its T68i phones would not become obsolete." It found, however, that plaintiffs did not cite any authority for such a theory and did not indicate which representations by AT&T constituted the alleged promise. Moreover, the court found that, to the extent plaintiffs alleged that AT&T made an express or implied promise that the T68i would be supported for the "life of the phone," "no reasonable consumer would hold this puffery to constitute a statement against obsolescence. A consumer who buys a phone

---

[9] We also note that AT&T challenged many of the facts alleged in the complaint, relying upon deposition testimony and other documents that were the subject of a request for judicial notice that AT&T filed concurrently with the demurrer and motion to strike. The trial court declined to take judicial notice of the deposition transcripts and some of the documents, but granted the request to take judicial notice of a wireless service agreement and the postcard AT&T sent to T68i owners regarding the free "upgrade" T226 replacement phone. Despite the trial court's ruling, which AT&T does not challenge on appeal, AT&T improperly cites to some of the excluded material in its respondent's brief on appeal. We disregard any reference in AT&T's respondent's brief to material that was not judicially noticed by the trial court.

under a warranty and a one- or two-year contract can reasonably expect only that his phone will last for the duration of the warranty and his service for the duration of the contract."

The court concluded: "In sum, no CLRA damages claim is stated because no CLRA notice was given. Plaintiffs' argument that pre-suit notice provided to [AT&T] as required by the CLRA may be provided 2 years into the case, with the filing of an amended complaint, is rejected. No fraud claim is stated because plaintiffs do not allege what specific misrepresentation was made to them that they relied on and were injured by. At most, a UCL or FAL claim might be found amongst the foliage, but plaintiffs have not identified where." Finding that plaintiffs had failed to identify with particularity any actionable misrepresentation by AT&T in four rounds of pleadings, and had given no indication how they could amend to successfully state a claim, the court sustained the demurrer without leave to amend and found that the motion to strike was moot.

Plaintiffs timely filed a notice of appeal from the subsequent judgment dismissing all claims against AT&T.

## DISCUSSION

### A. *Standard of Review*

"A general demurrer is a trial of a pure issue of law and 'presents the same question to the appellate court as to the trial court, namely, whether the plaintiff has alleged sufficient facts to justify any relief, notwithstanding superfluous allegations or claims for unjustified relief. [Citations.] "[T]he allegations of the complaint must be liberally construed with a view to attaining substantial justice among the parties. (Code Civ. Proc., § 452.)" [Citation.] Pleading defects which do not affect substantial rights of the parties should be disregarded. (Code Civ. Proc., § 475; [citation].)' " (*Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356, 1371 [89 Cal.Rptr.3d 659].) When reviewing a dismissal following a demurrer, "[w]e not only treat the demurrer as admitting all material facts properly pleaded, but also 'give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]' [Citation.]" (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38 [77 Cal.Rptr.2d 709, 960 P.2d 513].)

### B. *The UCL Cause of Action*

■ We note at the outset that, in the November 2004 general election, the voters approved Proposition 64, which amended the standing provisions of

the UCL. While the UCL "previously authorized any person acting for the general public to sue for relief from unfair competition," after Proposition 64 a private plaintiff has standing to bring a claim under the UCL only if he or she has " 'suffered injury in fact and has lost money or property as a result of [the] unfair competition.' " (*Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 227 [46 Cal.Rptr.3d 57, 138 P.3d 207], quoting Bus. & Prof. Code, § 17204, as amended by Prop. 64, § 3.) But despite the changes to the standing requirements, the Proposition 64 amendments to the UCL " 'left entirely unchanged the substantive rules governing business and competitive conduct. Nothing a business might lawfully do before Proposition 64 is unlawful now, and nothing earlier forbidden is now permitted.' " (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 314 [93 Cal.Rptr.3d 559, 207 P.3d 20] (*Tobacco II*).) Thus, pre-Proposition 64 case law that describes the kinds of conduct outlawed under the UCL is applicable to post-Proposition 64 cases such as the present case. The only difference is that, after Proposition 64, plaintiffs (but not absent class members in a class action) must establish that they meet the Proposition 64 standing requirements. (*Tobacco II, supra*, 46 Cal.4th at p. 320.)

■ The UCL outlaws as unfair competition "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." (Bus. & Prof. Code, § 17200.) "The scope of the UCL is quite broad. [Citations.] Because the statute is framed in the disjunctive, a business practice need only meet one of the three criteria to be considered unfair competition. [Citation.]" (*McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1471 [49 Cal.Rptr.3d 227] (*McKell*).) In addition to pleading facts sufficient to show that the defendant's acts constituted an unlawful, unfair, or fraudulent business practice, a plaintiff alleging a UCL cause of action must also plead facts sufficient to establish he or she has standing to bring an action under the UCL as amended by Proposition 64.

In the instant case, AT&T demurred to plaintiffs' UCL claim on the grounds that the complaint did not allege conduct that was unlawful, unfair, or fraudulent, nor did it allege facts to establish plaintiffs' standing under Proposition 64.[10] In sustaining the demurrer to the UCL claim, the trial court did not specifically address these grounds. Instead, the court found that the claim was not identifiable in light of all the extraneous allegations. Respectfully, we disagree. While those extraneous allegations certainly make it

---

[10] Although AT&T also argued in its demurrer that the CLRA provided the exclusive remedy for the conduct alleged, thus precluding plaintiffs' UCL claim, it does not make that argument on appeal. In any event, that argument lacks merit, inasmuch as the CLRA expressly provides that it does *not* preclude claims or remedies under other statutes. (Civ. Code, § 1752.) The cases upon which AT&T relied in making this argument in each of its demurrers were decided before the CLRA was amended to make clear that the CLRA did not limit the remedies available under other statutes.

significantly more difficult to identify the basis for plaintiffs' UCL claim, we hold there are sufficient facts alleged to show both a violation of the UCL and that plaintiffs have standing to bring their UCL claim.

### 1. *The Allegations Are Sufficient to Show a Violation of the UCL*

■ Plaintiffs argue that they have stated a valid UCL claim under all three prongs of the UCL, i.e., that the conduct alleged was unlawful, unfair, *and* fraudulent within the meaning of the UCL. The definitions of unlawful and fraudulent business practices are straightforward and well established. An unlawful business practice under the UCL is " ' " 'anything that can properly be called a business practice and that at the same time is forbidden by law.' " ' " (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech*).) A fraudulent business practice is one in which " ' " 'members of the public are likely to be deceived.' " ' " (*Tobacco II, supra,* 46 Cal.4th at p. 312.)

The definition of an unfair business practice in the context of a consumer action is less settled. Before 1999, some Courts of Appeal held that "an 'unfair' business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers" (*People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 530 [206 Cal.Rptr. 164]; accord, *Wolfe v. State Farm Fire & Casualty Ins. Co.* (1996) 46 Cal.App.4th 554, 560 [53 Cal.Rptr.2d 878]), while others held that the determination whether a practice is unfair "involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer" (*Motors, Inc. v. Times Mirror Co.* (1980) 102 Cal.App.3d 735, 740 [162 Cal.Rptr. 543]; accord, *State Farm Fire & Casualty Co. v. Superior Court* (1996) 45 Cal.App.4th 1093, 1103–1104 [53 Cal.Rptr.2d 229]). In 1999, the Supreme Court defined "unfair" in the context of a UCL action by one competitor against a direct competitor, stating that "any finding of unfairness to competitors under [the UCL must] be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." (*Cel-Tech, supra,* 20 Cal.4th at pp. 186–187.) But the Supreme Court also made clear that its discussion about "unfair" practices was limited to actions by competitors alleging anticompetitive practices, and did not relate to actions by consumers. (*Id.* at p. 187, fn. 12.) Nevertheless, some Courts of Appeal have applied the *Cel-Tech* definition of "unfair" to consumer actions (see, e.g., *Gregory v. Albertson's, Inc.* (2002) 104 Cal.App.4th 845, 854 [128 Cal.Rptr.2d 389]; *Schnall v. Hertz Corp.* (2000) 78 Cal.App.4th 1144, 1166 [93 Cal.Rptr.2d 439]), while others (including this court) have applied the old definitions (see, e.g., *Pastoria v. Nationwide Ins.* (2003) 112

Cal.App.4th 1490 [6 Cal.Rptr.3d 148]; *Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 718 [113 Cal.Rptr.2d 399]). Recently, in *Camacho v. Automobile Club of Southern California* (2006) 142 Cal.App.4th 1394 [48 Cal.Rptr.3d 770], a consumer action, Division Eight of this appellate district rejected both definitions and instead applied a definition based upon section 5 of the Federal Trade Commission Act (15 U.S.C. § 41 et seq.; see 15 U.S.C. § 45(n)). Under the definition in *Camacho*, a practice is unfair if (1) the consumer injury is substantial, (2) the injury is not outweighed by any countervailing benefits to consumers or competition, and (3) the injury is one that consumers themselves could not reasonably have avoided. (*Camacho, supra,* 142 Cal.App.4th at p. 1403.)

In this case, we need not, and do not, decide whether the conduct alleged meets any of the definitions of "unfair" (or whether it meets the definition of "unlawful") because we find that plaintiffs have alleged a fraudulent business practice under the UCL.

■ A claim based upon the fraudulent business practice prong of the UCL is "distinct from common law fraud. 'A [common law] fraudulent deception must be actually false, known to be false by the perpetrator and reasonably relied upon by a victim who incurs damages. None of these elements are required to state a claim for . . . relief' under the UCL. [Citations.] This distinction reflects the UCL's focus on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices." (*Tobacco II, supra,* 46 Cal.4th at p. 312.)

■ As noted above, a fraudulent business practice is one that is likely to deceive members of the public. (*Tobacco II, supra,* 46 Cal.4th at p. 312.) A UCL claim based on the fraudulent prong can be based on representations that deceive because they are untrue, but " ' "also those which may be accurate on some level, but will nonetheless tend to mislead or deceive. . . . A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under" ' the UCL." (*McKell, supra,* 142 Cal.App.4th at p. 1471.) For example, in *Pastoria v. Nationwide Ins., supra,* 112 Cal.App.4th 1490, the plaintiffs alleged (1) they purchased insurance policies based upon the defendant insurance company's description of the premiums, lack of deductibles, and other policy benefits; (2) less than two months later the insurer notified them of significant changes to their policies, including material increases in premiums and substantial deductibles; and (3) the insurer knew of the impending changes to the policies at the time the plaintiffs purchased them, but did not communicate that to the plaintiffs. (*Id.* at

p. 1493.) We held that those allegations were sufficient to state a claim for relief under the fraudulent business practices prong of the UCL. (*Pastoria*, at p. 1499.)

In the present case, plaintiffs alleged that (1) AT&T marketed and sold expensive T68i phones (which could be operated only on the AT&T GSM/GPRS network) in conjunction with multiyear service plans, and touted the improvements it was making to its GSM/GPRS network; (2) the improvements AT&T made to the network significantly degraded the portion of the network on which the T68i phones operated; and (3) AT&T knew at the time it sold the T68i phones that the improvements it was going to make would soon render the T68i phones essentially useless.

AT&T argues that these allegations are insufficient to state a claim because they "fall far short of pleading any type of actionable deception on the part of AT&T or proper reliance on the part of its consumers." But AT&T's argument fails to recognize the distinction between common law fraud, which requires allegations of actual falsity and reasonable reliance pleaded with specificity, and the fraudulent prong of the UCL, which does not.[11] (*Tobacco II, supra*, 46 Cal.4th at p. 312; see also *id*. at p. 320 ["relief under the UCL is available without individualized proof of deception, reliance and injury"]; *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 212, fn. 11 [197 Cal.Rptr. 783, 673 P.2d 660] (*Children's Television*) ["The requirement that fraud be pleaded with specificity . . . does not apply to causes of action under the [UCL]."].)

Moreover, AT&T's assertion that the representations upon which plaintiffs' UCL claim is based are not actionable because those representations were "puffery," statements of opinion, or predictions of future events ignores the gravamen of plaintiffs' claim. Their claim is not based upon their reliance on specific representations they assert were false; it is based upon the effect on consumers from AT&T's sale of an expensive cell phone in conjunction with multiyear agreements for the service needed to operate the phone, and AT&T's marketing campaign that touted its improving and expanding network. They allege this conduct by AT&T led reasonable consumers to believe that AT&T would continue to provide the service needed to operate the phone for a reasonable period of time, which they allege was the reasonable life of the phone.

■ "The determination as to whether a business practice is deceptive is based on the likely effect such [a] practice would have on a reasonable

---

[11] We reiterate that we are discussing here the facts required to establish a fraudulent business practice, and not the facts required to establish Proposition 64 standing.

consumer." (*McKell, supra,* 142 Cal.App.4th at p. 1471.) "[U]nless we can say as a matter of law that contrary to the complaint's allegations, members of the public were *not* likely to be deceived or misled by [AT&T's alleged conduct], we must hold that [plaintiffs] stated a cause of action." (*Day v. AT & T Corp.* (1998) 63 Cal.App.4th 325, 333 [74 Cal.Rptr.2d 55].) The trial court in this case found that consumers would not have been deceived by AT&T's alleged conduct because "[a] consumer who buys a phone under a warranty and a one- or two-year contract can reasonably expect only that his phone will last for the duration of the warranty and his service for the duration of the contract." We disagree that, in light of the conduct alleged in this case, this determination can be made as a matter of law. Therefore, we hold that plaintiffs stated a cause of action under the UCL.

### 2. *The Allegations Are Sufficient to Show Standing*

■ As noted above, Proposition 64 amended the UCL to provide a standing requirement for persons seeking relief under the UCL: a person bringing an action under the UCL must establish that he or she "has suffered injury in fact and has lost money or property as a result of the unfair competition." (Bus. & Prof. Code, § 17204.) In *Tobacco II, supra,* 46 Cal.4th 298, the Supreme Court held that this standing requirement applies only to the named plaintiffs in a class action (*id.* at pp. 320–321), and that it imposes an actual reliance requirement on named plaintiffs seeking relief under the fraudulent prong of the UCL (46 Cal.4th at p. 326). The court went on to explain what a plaintiff must plead and prove: "while a plaintiff must allege that the defendant's misrepresentations were an immediate cause of the injury-causing conduct, the plaintiff is not required to allege that those misrepresentations were the sole or even the decisive cause of the injury-producing conduct. Furthermore, where, as here, a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements." (*Id.* at p. 328.)

In the present case, plaintiffs alleged that, before buying their T68i phones, they each conducted research in which they encountered AT&T advertisements and press releases explaining the advanced features of the T68i and the improvements AT&T was making and was going to make to its GSM/GPRS network. They also alleged that they each were subjected to similar representations when they went to the AT&T store and purchased their phones and service plans, and that they relied upon their research (including information

from the AT&T advertisements and press releases, and the in-store representations) in deciding to purchase the T68i from AT&T.[12] Finally, they alleged that their T68i phones became essentially useless within a relatively short period of time, when AT&T made changes to the GSM/GPRS network that degraded service to the phones.

■ These allegations satisfy the UCL standing requirements. Plaintiffs were not required, as AT&T asserts, to plead the specific advertisements or representations they relied upon in making their decisions to purchase the T68i. (*Tobacco II, supra*, 46 Cal.4th at pp. 327–328.) Although the advertising campaign alleged in this case was not as long-term a campaign as the tobacco companies' campaign discussed in *Tobacco II*, it is alleged to have taken place over many months, in several different media, in which AT&T consistently promoted its GSM/GPRS network as reliable, improving, and expanding. Whether AT&T's representations were material (and therefore gave rise to a presumption of reliance) cannot be determined on demurrer. ■ As the Supreme Court noted, " 'a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material. [Citations.] A misrepresentation is judged to be "material" if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question" [citations], and as such materiality is generally a question of fact unless the "fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it." [Citation.]' [Citation.]" (*Id.* at p. 327.)

In short, we hold that the trial court erred by sustaining AT&T's demurrer to plaintiffs' UCL cause of action.

---

[12] At oral argument, AT&T's counsel asserted that plaintiffs could not have relied upon any representations about AT&T improving the GSM/GPRS network when they bought their T68i phones because they allege those representations were made on dates after they bought their phones. That is incorrect. The complaint alleged that AT&T announced in January 2002 that AT&T and Cingular Wireless had entered into a joint venture that would "allow both carriers [to] expand their buildout of GSM/GPRS along 3000 miles of interstate highway" and that AT&T would "provide its customers with the benefits of seamless GSM coverage in more markets." It also alleged that AT&T issued a press release in March 2002 announcing the expansion of its portfolio of GSM/GPRS phones, in which it represented that the T68i operated on 900, 1800, and 1900 MHz GSM networks, which it stated "will allow customers to use their wireless phone domestically or when traveling abroad." And in September 2002—the same month Morgan bought his T68i, and five months before Shannon bought his T68i— AT&T issued a press release announcing the expansion of its GSM/GPRS network into several markets (including Los Angeles), and representing that its network was "based on the GSM/GPRS global standard" and that is was "providing reliable voice services" as well as other features. The complaint also alleged that in October 2002—before Shannon bought his phone—AT&T announced the completion of its GSM/GPRS rollout in major markets and stated it "would continue to extend and enhance the network over the coming year."

## C. *The FAL Cause of Action*

Although ordinarily "[a] violation of the UCL's fraud prong is also a violation of the [FAL]" (*Tobacco II, supra*, 46 Cal.4th at p. 312, fn. 8), the FAL cause of action alleged in plaintiffs' third amended complaint is not based upon the same conduct alleged in the UCL cause of action. Instead, plaintiffs' FAL cause of action is based upon AT&T's February 2004 offer of a "free upgrade" phone to owners of the T68i phone. Plaintiffs allege this offer was untrue or misleading because the phone AT&T offered did not have international capabilities or the other advanced features that the T68i had, and because the offer induced members of the class to return their T68i phones.

 AT&T argues that plaintiffs do not have standing to bring this claim. AT&T is correct. Proposition 64 made identical changes to the standing requirements to bring an action under the FAL as it made to the requirements under the UCL. (*Californians for Disability Rights v. Mervyn's, LLC, supra*, 39 Cal.4th at p. 229, fn. 2.) A person bringing an action under the FAL must establish that he or she "has suffered injury in fact and has lost money or property as a result of a violation of [the FAL]." (Bus. & Prof. Code, § 17535.) Even if it could be said that the return of a phone that plaintiffs alleged was "useless" constituted an injury in fact, plaintiffs alleged that each of them declined to return their T68i phone. Therefore, they cannot truthfully allege that they lost money or property as a result of AT&T's offer. Accordingly, the trial court did not err by sustaining the demurrer to the FAL cause of action.

## D. *The CLRA Cause of Action*

 "The CLRA makes unlawful, in Civil Code section 1770, subdivision (a), . . . various 'unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer.' " (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 639 [88 Cal.Rptr.3d 859, 200 P.3d 295].) It provides that any consumer who suffers damage as a result of an act or practice declared unlawful in the CLRA may seek to recover actual damages, punitive damages, or injunctive relief. (Civ. Code, § 1780.) However, the CLRA includes a prefiling notice requirement on actions seeking damages. At least 30 days before filing a claim for damages under the CLRA, "the consumer must notify the prospective defendant of the alleged violations of [the CLRA] and '[d]emand that such person correct, repair, replace or otherwise rectify the goods or services alleged to be in violation' thereof. ([Civ. Code,] § 1782, subd. (a)(2).) If, within this 30-day period, the prospective defendant corrects the alleged wrongs, or indicates that it will make such corrections within a reasonable time, no cause of action

for damages will lie. *This notice requirement need not be complied with in order to bring an action for injunctive relief.* ([Civ. Code,] § 1782, subd. (d).)" (*Kagan v. Gibraltar Sav. & Loan Assn.* (1984) 35 Cal.3d 582, 590 [200 Cal.Rptr. 38, 676 P.2d 1060], italics added, disapproved on other grounds in *Meyer v. Sprint Spectrum L.P., supra,* 45 Cal.4th at p. 643, fn. 3.)

In the present case, plaintiffs did not allege a claim for damages under the CLRA until they filed their second amended complaint—the original and first amended complaints sought only injunctive relief under the CLRA. Although they alleged in the second amended complaint that they had provided the notice required under the CLRA in their previous complaints, the trial court sustained AT&T's demurrer to their claim on the ground, among others, that they had not properly complied with the notice requirement. They then filed their third amended complaint, in which they alleged that they sent the required notice in January 2007—four months before they filed their third amended complaint, in which they once again sought damages under the CLRA.

In that complaint, they alleged that AT&T's conduct violated several subsections of Civil Code section 1770, subdivision (a), but they rely on appeal on a single subsection: they allege that AT&T violated Civil Code section 1770, subdivision (a)(5) by " '[r]epresenting that goods or services have . . . characteristics . . . uses, benefits . . . which they do not have.' " AT&T did not specifically address the merits of plaintiffs' CLRA claim in its demurrer to the third amended complaint, nor does it address the merits in its respondent's brief on appeal. Instead, AT&T argues that plaintiffs' CLRA claim fails because plaintiffs did not send the required notice before commencement of the lawsuit. AT&T's argument is contrary to the express language of the notice statute. Plaintiffs (or their predecessor) were not required to provide notice before filing the original or first amended complaints because they did not seek damages under the CLRA in those complaints. Thus, as stated in Civil Code section 1782, subdivision (d), no notice was required. Moreover, that statute contemplates that a consumer may amend a complaint for injunctive relief to add a request for damages under the CLRA. Indeed, the statute expressly allows such an amendment, as long as it is done 30 days or more after filing of the original complaint and compliance with the notice requirement. (Civ. Code, § 1782, subd. (d).)

 To the extent AT&T argues that plaintiffs were precluded from seeking damages under the CLRA by failing to comply with the notice requirement before filing the second amended complaint in which they first

sought such damages, we disagree.[13] The federal district court cases upon which AT&T relies for its assertion that failure to comply with the notice requirement requires dismissal *with prejudice* fail to properly take into account the purpose of the notice requirement. That requirement exists in order to allow a defendant to avoid liability for damages if the defendant corrects the alleged wrongs within 30 days after notice, or indicates within that 30-day period that it will correct those wrongs within a reasonable time. (See, e.g., *Meyer v. Sprint Spectrum L.P., supra*, 45 Cal.4th at p. 642; *Kagan v. Gibraltar Sav. & Loan Assn., supra*, 35 Cal.3d at p. 590.) A dismissal *with prejudice* of a damages claim filed without the requisite notice is not required to satisfy this purpose. Instead, the claim must simply be dismissed until 30 days or more after the plaintiff complies with the notice requirements. If, before that 30-day period expires the defendant corrects the alleged wrongs or indicates it will correct the wrongs, the defendant cannot be held liable for damages.

Because plaintiffs in this case alleged that they sent the required notice to AT&T more than 30 days before they filed the third amended complaint and that AT&T failed to correct the alleged wrongs, the trial court erred by sustaining the demurrer for failure to comply with the CLRA notice requirements.

## E. *The Fraud Cause of Action*

Plaintiffs' fraud claim, like its UCL claim, is primarily premised on a failure to disclose. In essence, plaintiffs assert that AT&T sold an expensive product that needed a specific service to operate and implied it would provide that service for some years (because it sold the product in conjunction with multiyear service plans and said it was improving and expanding its network), and that plaintiffs and other class members were deceived because AT&T failed to disclose it would essentially "turn off" the service within two years.[14] As noted above, the trial court sustained the demurrer to the fraud claim because it found that plaintiffs had not pleaded the claim with the requisite specificity. We hold that, in the circumstances of this case, plaintiffs have alleged their fraud claim with sufficient specificity.

 The requirements for pleading fraud in most cases is well established: " ' "fraud must be pled specifically; general and conclusory allegations

---

[13] We need not, and therefore do not, decide whether plaintiffs' "notice" set forth in the original and first amended complaint complied with Civil Code section 1782.

[14] To the extent plaintiffs' fraud claim is also premised on an alleged affirmative misrepresentation—AT&T's statement that the T226 was an "upgrade," which was made to induce T68i owners to return their phones—plaintiffs' claim fails because they do not allege that they relied upon AT&T's statement and returned their phones.

do not suffice. [Citations.] 'Thus " 'the policy of liberal construction of the pleadings . . . will not ordinarily be invoked to sustain a pleading defective in any material respect.' " [Citation.] [¶] This particularity requirement necessitates pleading facts which "show how, when, where, to whom, and by what means the representations were tendered." ' " ' [Citation.]" (*Alfaro v. Community Housing Improvement System & Planning Assn., Inc., supra,* 171 Cal.App.4th at p. 1384.) If a fraud claim is based upon failure to disclose, and "the duty to disclose arises from the making of representations that were misleading or false, then those allegations should be described." (*Ibid.*)

But as the Supreme Court has noted, there are "certain exceptions which mitigate the rigor of the rule requiring specific pleading of fraud." (*Children's Television, supra,* 35 Cal.3d at p. 217.) For example, where a fraud claim is based upon numerous misrepresentations, such as an advertising campaign that is alleged to be misleading, plaintiffs need not allege the specific advertisements the individual plaintiffs relied upon; it is sufficient for the plaintiff to provide a representative selection of the advertisements or other statements to indicate the language upon which the implied misrepresentations are based. (*Id.* at p. 218.) But the court also noted that where a claim of fraud is based upon a long-term advertising campaign, which "may seek to persuade by cumulative impact, not by a particular representation on a particular date . . . [p]laintiffs should be able to base their cause of action upon an allegation that they acted in response to an advertising campaign even if they cannot recall the specific advertisements." (*Id.* at p. 219.)

In this case, plaintiffs alleged that AT&T's statements in advertisements and press releases regarding the T68i and its advanced features and the improvements it was making to its GSM/GPRS network—some of which plaintiffs quoted in the complaint—were misleading because AT&T failed to disclose that the improvements it was making would soon render the T68i useless. These allegations were sufficient to satisfy the purposes of the specificity requirement: to " 'furnish the defendant with certain definite charges which can be intelligently met' " and " ' "to enable the court to determine whether, on the facts pleaded, there is any foundation, prima facie at least, for the charge of fraud." ' " (*Children's Television, supra,* 35 Cal.3d at pp. 216–217.) Therefore, we hold that plaintiffs adequately alleged a claim for relief.

## F. *The Declaratory Relief Claim*

Although the trial court did not specifically address the declaratory relief cause of action in its ruling on the demurrer to the third amended complaint, it sustained the demurrer to the entire complaint. In their opening brief on appeal, plaintiffs did not address the dismissal of their declaratory relief

claim. Therefore, we find they have abandoned that claim. (*Wurzl v. Holloway* (1996) 46 Cal.App.4th 1740, 1754, fn. 1 [54 Cal.Rptr.2d 512].)

## DISPOSITION

The dismissal of the FAL and declaratory relief causes of action is affirmed; the dismissal of the remaining causes of action is reversed. Plaintiffs shall recover their costs on appeal.

Manella, J., and Suzukawa, J., concurred.